# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Richard Templin and James Banigan; | § | |
| | § | |
| STATE OF CALIFORNIA, *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF DELAWARE, *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| DISTRICT OF COLUMBIA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF FLORIDA *ex rel.* | § | CIVIL NO. 07-12153-RWZ |
| Richard Templin and James Banigan; | § | |
| STATE OF GEORGIA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF HAWAII *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF ILLINOIS *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF INDIANA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | **FILED IN CAMERA AND** |
| STATE OF LOUISIANA *ex rel.* | § | **UNDER SEAL** |
| Richard Templin and James Banigan; | § | |
| COMMONWEALTH OF MASSACHUSETTS | § | |
| *ex rel.* Richard Templin and James Banigan; | § | |
| STATE OF MICHIGAN *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF MONTANA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF NEVADA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF NEW HAMPSHIRE *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF NEW MEXICO *ex rel.* | § | JURY TRIAL DEMANDED |
| Richard Templin and James Banigan; | § | |
| STATE OF NEW YORK *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF OKLAHOMA *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |
| STATE OF TENNESSEE *ex rel.* | § | |
| Richard Templin and James Banigan; | § | |

STATE OF TEXAS *ex rel.*                          §
Richard Templin and James Banigan;               §
COMMONWEALTH OF VIRGINIA *ex rel.*               §
Richard Templin and James Banigan;               §
STATE OF NEW JERSEY *ex rel.*                     §
Richard Templin and James Banigan;               §
STATE OF RHODE ISLAND *ex rel.*                   §
Richard Templin and James Banigan;               §
STATE OF WISCONSIN *ex rel.*                      §
Richard Templin and James Banigan;               §
STATE OF CONNECTICUT *ex rel.*                    §
Richard Templin and James Banigan;               §
STATE OF NORTH CAROLINA *ex rel.*                 §
Richard Templin and James Banigan;               §
CITY OF CHICAGO *ex rel.*                          §
Richard Templin and James Banigan;               §
STATE OF COLORADO *ex rel.*                        §
Richard Templin and James Banigan;               §
STATE OF MARYLAND *ex rel.*                        §
Richard Templin and James Banigan;               §
STATE OF MINNESOTA *ex rel.*                       §
Richard Templin and James Banigan;               §
                                                  §
                                                  §
        Plaintiffs,                               §
                                                  §
                                                  §
VS.                                               §
                                                  §
                                                  §
ORGANON USA INC.; OMNICARE, INC.;                 §
PHARMERICA, INC.; ORGANON                         §
BIOSCIENCES N.V.; SCHERING PLOUGH                 §
CORP; AKZO NOBEL N.V.; ORGANON                    §
INTERNATIONAL, INC; ORGANON                       §
PHARMACEUTICALS USA, INC.; and                    §
MERCK CO. & INC.                                  §
Defendants.                                       §

**THIRD AMENDED COMPLAINT OF RELATORS
RICHARD TEMPLIN AND JAMES BANIGAN
PURSUANT TO FEDERAL FALSE CLAIMS ACT
<u>AND VARIOUS STATE FALSE CLAIMS ACTS</u>**

TABLE OF CONTENTS

|  | | **Page** |
|---|---|---|
| I. | Introduction | 1 |
| II. | Parties | 6 |
| III. | Respondeat Superior and Vicarious Liability | 12 |
| IV. | Successor Liability | 12 |
| V. | Jurisdiction and Venue | 13 |
| VI. | Overview of Medicaid, 340B and Other Federal Healthcare Programs | 15 |
| | A. | The Medicaid Program | 15 |
| | B. | 340B Covered Entities | 16 |
| | C. | Other Federal Purchasers | 17 |
| VII. | Statutory Background | 17 |
| | A. | The False Claims Act | 17 |
| | B. | The Federal Anti-Kickback Statute | 18 |
| VIII. | Overview of Remeron and the Long-Term Care Arena | 19 |
| | A. | Remeron: Regulatory History | 19 |
| | B. | Remeron Sales to Long-Term Care | 21 |
| IX. | Organon's Scheme to Defraud Medicaid by Offering Financial Inducements to Long-Term Care Pharmacy Providers to Purchase and Recommend Remeron Tablet and Remeron SolTab | 23 |
| | A. | Organon's Kickbacks to Long-Term Care Pharmacy Providers from 1999 to 2000 | 23 |
| | B. | Organon's 2000 to 2005 Scheme to Defraud Medicaid by Offering Kickbacks to Long-Term Care Pharmacy Providers | 25 |
| | C. | Marketing Strategies and Tools | 31 |

i

i.      2001 Business Plan for Selling Remeron to Long-Term Care ................. 31

ii.     The "Remeron-SolTab Therapeutic Interchange Toolkit" ...................... 33

        a.      Organon's Toolkit Promoted Remeron's Sedative Qualities and
                Convenience for LTC Administrators in the Name of
                "Therapeutic Efficacy" ................................................................. 34

        b.      Organon's Toolkit Advised LTC Customers to Adopt Remeron as
                Their Preferred Anti-Depressant Based First and Foremost on
                Their Opportunity to Profit at Medicaid's Expense ...................... 34

        c.      Organon's Toolkit Showed LTC Customers Exactly How to
                Control Which Anti-Depressant was Prescribed to Their Disabled
                and Elderly Patients .................................................................... 35

D.      Organon's Offer of and Long-Term Care Pharmacy Providers'
        Solicitation of Kickbacks ........................................................................ 37

        i.      PharMerica ................................................................................... 37

        ii.     Omnicare ...................................................................................... 41

        iii.    NeighborCare ............................................................................... 44

        iv.     NCS Healthcare ............................................................................ 46

        v.      American Pharmaceutical Services ("APS") .............................. 47

        vi.     Sunscript ...................................................................................... 48

E.      Long-Term Care Pharmacy Providers' Paid Bonuses to Pharmacy Managers
        Based on Medicaid Profit ........................................................................ 48

X.      Organon Decreased Its Obligations Under Its Rebate Agreements With
        State Medicaid Programs and Failed to Report the True Best Price ................. 49

        A.      Meaning of "Average Manufacturer Price" and "Best Price" .............. 50

        B.      Organon Decreased its Obligations under its Rebate Agreements with
                State Medicaid Programs ........................................................................ 51

C.      Organon Avoided Reporting the True Best Price by Mischaracterizing
        Transactions as Nominal or Entering Into Improper Discount Arrangements ..... 52

D.      Organon Sold Remeron at 340B Pricing to Ineligible Entities,
        Causing its Best Price Reporting to be Inaccurate for Some Quarters ................ 55

XI.   Organon's Off-Label Marketing of Remeron .................................................................... 58

A.      Statutory and Regulatory Background ................................................................ 58

        i.      The FDA's Role in Regulation of Prescription Drugs ............................. 58

                a.      FDA Approval of Prescription Drugs ........................................... 58

                b.      FDA Regulation of Manufacturers' Marketing of
                        Prescription Drugs ........................................................................ 59

        ii.     Reimbursement of Off-Label Prescription Drugs Under Medicaid .......... 61

B.      Organon's Off-Label Marketing Scheme ........................................................... 64

        i.      FDA Approval of Remeron and Remeron SolTab .................................... 64

        ii.     Off-Label Marketing of Remeron and Remeron SolTab .......................... 66

                a.      1999 FDA Warning Letter ............................................................ 66

                        (I)      Anti-Anxiety .................................................................... 67

                        (II)     Remeron is More Effective than SSRIs ........................... 68

                        (III)    Remeron Lacks Significant Inhibition of
                                 Cytochrome P450 Enzymes ............................................. 68

                b.      Organon's Continued Misrepresentations About Remeron .......... 68

                c.      Organon's Marketing Remeron for Treatment of Depression,
                        ADD and ADHD in Children and Adolescents ........................... 72

C.      Organon's Use of Kickbacks ............................................................................. 73

        i.      Speaker Programs ..................................................................................... 74

        ii.     Advisory Boards ....................................................................................... 74

iii

iii.    Preceptorships ........................................................................ 74

iv.    Gifts in Kind ........................................................................... 75

v.    Fees for Bogus Clinical Trials and Studies.............................. 75

XII.    Introduction to Relators ........................................................................ 76

    A.    Background of Relators ............................................................ 76

        i.    Jim Banigan ............................................................. 76

        ii.    Richard Templin ...................................................... 76

    B.    Relators' Discovery of Organon's Medicaid Scheme............................. 77

    C.    Retaliation of Relators Banigan and Templin....................................... 81

        i.    Jim Banigan ............................................................. 81

        ii.    Richard Templin ...................................................... 83

XIII.    Actionable Conduct by Organon, PharMerica, and Omnicare Under the False Claims Act ........................................................................... 85

    A.    Applicable Law ........................................................................ 85

        i.    The False Claims Act................................................ 85

        ii.    The Federal Anti-Kickback Statute .......................... 87

    B.    Fraudulent Conduct by Organon, PharMerica, and Omnicare Violates the FCA ..................................................................... 89

        i.    Organon Caused Long-Term Care Pharmacy Providers to Submit False Claims by Offering Kickbacks and Long-Term Care Pharmay Providers Solicited and Accepted Kickbacks in Violation of the Anti-Kickback Statute and the FCA ............................................................. 89

        ii.    Organon Conspired with Its Long-Term Care and GPO Customers to Defraud Medicaid in Violation of the FCA .......................................... 91

iv

iii.    Organon Intentionally Decreased Its Rebate Liability to State Medicaid Programs ................................................................................. 93

iv.    Organon's Off-Label Marketing Scheme Violated the FCA ................... 95

v.    Organon and Schering Plough Retaliated Against Banigan and Templin in Violation of the FCA ....................................... 97

vi.    Damages ................................................................................. 97

XIV.    Causes of Action ................................................................................. 98

A.    Count I - False Claims (31 U.S.C. § 3729(a)) ...................................... 98

B.    Count II - False Records or Statements (31 U.S.C. § 3729(a)) ........................... 98

C.    Count III - Conspiracy (31 U.S.C. § 3729(a)) ...................................... 99

D.    Count IV -  Reverse False Claims (31 U.S.C. § 3729(a)) ..........................100

E.    Count V - Retaliation (31 U.S.C. § 37309(h)) ..........................101

Relief  ........................................................................................................ 101

Prayer  ....................................................................................................... 102

F.    Count VI - California False Claims Act ....................................... 102

G.    Count VII - Delaware False Claims and Reporting Act ..................................... 105

H.    Count VIII - District of Columbia Procurement Reform Amendment Act. ....... 108

I    Count IX - Florida False Claims Act ................................................... 110

J.    Count X - Georgia State False Medicaid Claims Act ......................................... 113

K.    Count XI - Hawaii False Claims Act ...................................................... 116

L.    Count XII - Illinois Whistleblower Reward and Protection Act ......................... 118

M.    Count XIII - Indiana False Claims and Whistleblower Protection Act ............. 121

N.    Count XIV - Louisiana Medical Assistance Programs Integrity Law ............... 123

O.      Count XV - Massachusetts False Claims Act ...................................................... 126

P.      Count XVI - Michigan Medicaid False Claims Act ........................................... 128

Q.      Count XVII - Montana False Claims Act ............................................................ 131

R.      Count XVIII - Nevada False Claims Act ............................................................ 134

S.      Count XIX - New Hampshire  Medicaid Fraud and False Claims Act ............. 136

T.      Count XX - New Jersey False Claims Act........................................................... 139

U.      Count XXI - New Mexico False Claims Acts ..................................................... 141

V.      Count XXII - New York False Claims Act.......................................................... 144

W.      Count XXIII - Oklahoma Medicaid False Claims Act ....................................... 147

X.      Count XXIV - Rhode Island State False Claims Act.......................................... 150

Y.      Count XXV - Tennessee Medicaid False Claims Act ........................................ 152

Z.      Count XXVI - Texas False Claims Act ............................................................... 155

AA.     Count XXVII - Virginia Fraud Against Taxpayer Act ....................................... 158

BB.     Count XXVIII - Wisconsin False Claims Act .................................................... 160

CC.     Count XXIX - Connecticut Act Implementing the Provisions of
        the Budget Concerning Human Services and Marketing Changes to
        Various Social Services Statutes (Conn. Pub. Act. No. 09-5) .......................... 163

DD.     Count XXX - North Carolina False Claims Act
        (N.C. Gen. Stat. § 1-605 *et seq.*) ....................................................................... 166

EE.     Count XXXI - City of Chicago False Claims Act ............................................. 168

FF.     Count XXXII - Colorado False Claims Act…………………………………....170

GG.     Count XXXIII - Maryland False Claims Act………………………………..173

HH      Count XXXIV - Minnesota False Claims Act…………………………………175

II.      Count XXXV - Common Relief Fund ................................................................... 178

XV.   Demand for Jury Trial ....................................................................................... 179

1.      The United States of America, the States of California, Colorado, Connecticut,

Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan,

Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North

Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of

Massachusetts and Virginia, the District of Columbia, and the City of Chicago, by and through

*qui tam* relators James Banigan and Richard Templin, bring this action under 31 U.S.C. §§

3729–3732 (the "False Claims Act") to recover all damages, penalties and other remedies

established by the False Claims Act on behalf of the United States and themselves and would

show the following:

## I.      INTRODUCTION

2.      This suit concerns pharmaceutical company Organon's seven-year scheme to

offer unlawful enticements to long-term care pharmacies in exchange for prescribing its anti-

depressants, Remeron Tablet and Remeron SolTab (collectively referred to as "Remeron"), to

their patients, resulting in hundreds of millions of dollars in wrongful Medicaid prescription

reimbursement costs.

3.      In the late 1990's, following an explosion of new for-profit businesses delivering

long-term care, and as those facilities and the pharmacies that served them began to consolidate

into a handful of large, powerful companies, Organon began to focus its Remeron marketing

efforts on the Medicaid-dominated long-term care sector.  Beginning in 1999, Organon began

offering special discounts exclusively to long-term care pharmacy providers, including "market

tier" discounts that grew as the customer attained ever higher market share for Remeron

compared with competitor drugs.  These market share discounts constituted kickbacks –

inducements designed to drive long-term care pharmacies' promotion of Remeron over other

antidepressants in a competitive field regardless of Remeron's clinical advantages or disadvantages.

4.     Meanwhile, Organon was looking for a solution to a related threat.  Following Remeron Tablet's patent expiration in 1998, Organon anticipated that generic competition, set to begin in 2001, could cause the company a catastrophic loss of profits.  In the face of that threat, Organon sought approval from the Food and Drug Administration (the "FDA") for a variant form of Remeron—an orally disintegrating tablet called Remeron SolTab—that was not initially rated AB equivalent[1] to Remeron Tablet by the FDA, and thus effectively barred generic competition for the variant form.  By the time that Remeron SolTab was approved in January of 2001, Organon had concocted a new initiative to convert as many long-term care patients as possible from Remeron Tablets to the patent-protected Remeron SolTab, and to continue to win long-term care market share from competitors.

5.     In late 2000, Organon began negotiating full-blown "therapeutic interchange" programs with its LTCPP customers, including nationwide chains PharMerica, Omnicare, NeighborCare, NCS Healthcare, APS, and Sunscript, under which these customers would replace a prescribed drug with Remeron Tablet or Remeron SolTab.  In addition, Organon offered its LTCPP customers a conversion rebate for converting Remeron Tablet prescriptions to patent-protected Remeron SolTab prescriptions.  Various tools to affect therapeutic interchange are within LTCPPs' arsenals, and Organon sought to become a beneficiary of these tools, from educational initiatives, to mass mailings requesting authorization to change prescriptions, to "NDC locks" to block pharmacists' computers from dispensing disfavored drugs.  In order to induce LTCPPs to adopt such therapeutic interchange programs, Organon offered a new array of

---

[1] The FDA rates a product "AB equivalent" to a branded drug if a study is submitted demonstrating bioequivalence to the branded product.  A product is deemed AB equivalent to another drug cannot use its patent to prevent generic entry.

kickbacks.  Organon began to offer its market share inducements in the form of rebates rather than discounts, in order to protect the inducements from disclosure in states in which Medicaid had begun to request actual invoices with pharmacist's reimbursement claims.  It also added ramp-up discounts, "conversion" rebates tied to conversion of Remeron Tablet prescriptions to Remeron SolTab prescriptions, and "therapeutic interchange" bonuses conditioned on LTCPPs bestowing Remeron Tablet and Remeron SolTab with a "preferred" status and engaging in an active therapeutic interchange program.

6.     Organon's willingness to extend indefinitely its contractual ramp-up discounts containing the highest levels of discounts demonstrates that the rebates served solely as kickbacks.  This ramp-up discount period was originally offered in February of 1999 and was intended to run only through June 1999; through various amendments, however, this ramp-up period was extended for years for many customers until it ultimately expired in the last remaining contracts on December 31, 2005 with the advent of Medicare Part D.

7.     Organon funneled payments of various sorts to LTCPPs as additional incentives to accomplish therapeutic interchange.  These collateral kickbacks, often solicited by the LTCPPS themselves, took the form of data sharing agreements for the purchase of LTCPP prescribing data, research grants, educational grants, access fees, sponsorship of long-term care pharmacy providers' annual meetings, advisory panels, and other forms of remuneration. Indeed, certain LTCPPs such as Omnicare solicited even more money in kickbacks than Organon could afford, and reserved their highest levels of participation for those willing and able to pay astronomical costs.

8.     Organon's senior care sales team, at the instruction of high-level executives, also offered LTCPPs an "opportunity to profit" from Medicaid as an added incentive to prescribe

Remeron over competitors.  The sales team described the "opportunity to profit" in detail to customers using profit calculators and models, visual aids, and the "Therapeutic Interchange Toolkit."

9.      Organon's sales pitch to long-term care was focused largely on financial advantages.  But Organon also specifically trained long-term care pharmacists and their attending clinicians to maximize their success in switching residents' competitor anti-depressant prescriptions to Remeron by promoting Remeron's short-term side effects of somnolence and weight gain as though they were FDA-approved indications.  In essence, Organon illegally held out the off-label promise of a more docile, easily controlled resident population in order to provide the clinical ruse to affect therapeutic interchange in the long-term care sector.

10.      Organon made similar off-label claims in marketing Remeron outside of the long-term care sector as well as additional off-label claims seeking pediatric and other usage.  In deliberately and deceptively marketing uses that had not been approved by the Food and Drug Administration ("FDA"), Organon caused Medicaid states to pay for prescriptions that were tainted by illegal off-label promotion, and accompanied by illegal kickbacks to physicians in the form of gifts and other remuneration.

11.      Organon's appeal to long-term care pharmacy providers to convert patients to Remeron Tablet and Remeron SolTab was spectacularly successful.  In fact, the market shares attained in long-term care were three times greater than any other market sector, fueled by Medicaid's dominance as a payor in long-term care.  Remeron was Organon's top selling drug from 1999 to 2005.  Remeron sales from 1999 to 2004 totaled an estimated $693 million in Medicaid sales, with $347.5 million in long-term care sales.

12.     Further, by engaging in this scheme to defraud Medicaid and other federal healthcare programs with long-term pharmacy providers, such as PharMerica and Omnicare, as well as group purchasing organizations, Organon effectively reduced its liability for Remeron Tablet and Remeron SolTab under its rebate agreement with Medicaid.  When calculating its average manufacturer price, Organon included as a deduction the deep discounts offered on Remeron Tablet and Remeron SolTab to long-term care customers, even though the discounts constituted illegal kickbacks, thus decreasing its average manufacturer price, which lowered its rebate liability to Medicaid accordingly.  In addition, Organon hid its true "best price" from the Government by entering into separate agreements with long-term care pharmacy providers that essentially amounted to kickbacks.  By failing to disclose to Medicaid these payments that it provided to long-term pharmacy providers, Organon concealed its true "best price" to Medicaid, thereby lowering its rebate liability to Medicaid.

13.     Organon also falsely reported pricing for a number of transactions involving Remeron Tablet and Remeron SolTab, further lowering the rebate it paid to state Medicaid programs.  For example, Organon on two occasions sold a high volume of Remeron SolTab to Omnicare and PharMerica at "bargain basement" prices in exchange for the simultaneous purchase of more Remeron SolTab at normal commercial prices without reporting these transactions together to Medicaid, thereby lowering Organon's rebate liability to state Medicaid programs.  Similarly, in 2001, realizing that discounts on Remeron provided under a 1997 fixed-price contract with Kaiser Permanente ("Kaiser") were setting a best price, Organon sought to amend this contract to increase the price of Remeron in exchange for providing the same amount of discounts on other Organon products that Medicaid either did not purchase or that were not setting a best price.  Kaiser initially rejected any revision as there was no provision for Organon

to take a price increase.  Kaiser offered Organon a way out of the contract in which Organon would pay all future discounts in advance to avoid continuing setting a best price.  In response, Organon proposed an amendment to buy its way out of the agreement.  Organon and Kaiser agreed to amend the contract by altering pricing retroactively on other drugs that had limited or no exposure to Medicaid.  In order to conceal the best price violation, Organon backdated the amendment and removed transactions for Remeron from its books.

14.    In addition, from 1999 to 2005, Organon intentionally or recklessly failed to maintain its membership list of 340B program "covered entities."  The 340B Pricing Program allows certain non-profits and other eligible entities to receive government pricing under the Public Health Service Act of 1992.  42 U.S.C. § 256b.  For six years, Organon failed to employ effective procedures that would have enabled it to properly monitor its membership list of 340B covered entities and thus avoid bestowing 340B pricing to customers who were not qualified to receive this special 340B pricing.  Prices provided to entities not qualified to receive the 340B pricing would have affected Remeron's true commercial "best price" to the private sector, but Organon failed to report these transactions at all, and after discovering the problem, Organon made no attempt to employ the necessary controls to avoid future mishaps, nor did Organon attempt to recoup discounts afforded to these ineligible entities, in effect, lowering its Medicaid rebate liability.

## II.    PARTIES

15.    Relator James Banigan is a citizen of the United States and a resident of the State of Arizona.

16.    Relator Richard Templin is a citizen of the United States and a resident of the State of New Jersey.

6

17.     Defendant Akzo Nobel is a Netherlands corporation specializing in chemical coatings.   Akzo Nobel conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.   Akzo Nobel may be served through its registered agent, Akzo Nobel, 7 Livingston Ave., Dobbs Ferry, NY  10522.

18.     Defendant Organon Biosciences N.V. was a Netherlands corporation created by Akzo Nobel in 2006 to oversee Organon USA, Inc., Organon International, Inc., and/or Organon Pharmaceuticals USA, Inc.   Organon Biosciences N.V. specialized in the development, manufacture, and sale of human and animal health care products and services, including pharmaceuticals.   Organon Biosciences N.V. conducted extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.   Organon Biosciences N.V. may be served through its registered agent, Akzo Nobel, 7 Livingston Ave., Dobbs Ferry, NY  10522.

19.     Defendant Organon USA, Inc. was a New Jersey corporation whose principal business was the development, manufacture, and sale of health care products and services, including pharmaceuticals.   Organon USA, Inc.'s principal place of business was at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033-0530.   Organon USA, Inc. conducted

extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  Organon USA, Inc. was wholly owned by Organon BioSciences N.V., which was in turn wholly owned by Akzo Nobel, a Netherlands corporation specializing in chemical coatings.  Organon USA, Inc. manufactured and sold prescription drugs that are paid for by state Medicaid programs, including such medications as Remeron Tablet and Remeron SolTab.  Akzo Nobel announced on March 12, 2007 its intent to sell Organon Biosciences N.V. to pharmaceutical company Schering-Plough for EUR 11 billion ($14.4 billion based on the closing exchange rate on March 9, 2007).  Schering-Plough finalized its acquisition of Organon BioSciences N.V. in November 2007, and Organon Biosciences N.V. became a subsidiary of Schering Plough.  Organon USA, Inc. may be served through its registered agent, Akzo Nobel, 7 Livingston Ave., Dobbs Ferry, NY  10522.

20.     Defendant Organon Pharmaceuticals USA, Inc. was a Delaware corporation whose principal business was the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Organon Pharmaceuticals USA, Inc. conducted extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  Organon Pharmaceuticals USA, Inc.

may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

21.     Defendant Organon International, Inc. was a Delaware corporation whose principal business was the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Organon International, Inc. conducted extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  Organon International, Inc. may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

22.     Defendants Organon USA, Inc., Organon Pharmaceuticals USA, Inc., Organon International, Inc., and Organon Biosciences N.V. were or at pertinent times were wholly-owned subsidiaries and pharmaceutical business units of Defendant Akzo Nobel N.V.

23.     Defendants Akzo Nobel, Organon USA, Inc., Organon Pharmaceuticals USA, Inc., Organon International, Inc., and Organon Biosciences N.V. are hereinafter referred to collectively as "Organon."  Defendants Organon USA, Inc. and Organon Biosciences N.V. are hereinafter referred to collectively as "Organon IBS."

24.     Defendant Schering-Plough is a New Jersey corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.   Schering-Plough conducts extensive business in the States of Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland,

Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  Schering-Plough may be served through its registered agent, The Corporation Trust Company, 820 Bear Tavern Rd, West Trenton, NJ  08628.

25.     Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Merck conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  On November 3, 2009, Merck and Schering-Plough combined in a stock and cash transaction, structured as a reverse merger in which Schering-Plough, renamed Merck, continued as the surviving public corporation.  Merck may be served through its registered agent, CT Corporation, 155 Federal Street, Suite 700, Boston, MA 02110.

26.     Defendant Omnicare, Inc. is a Delaware corporation whose principal business is providing pharmacy services to patients in long-term care settings.  Omnicare's principal place of business is 100 East RiverCenter Boulevard, Covington, Kentucky 41011.  Omnicare conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of

Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  From 2001 to 2005, Omnicare, headquartered in Covington, Kentucky, systematically acquired its competitor long-term care pharmacy providers, NeighborCare, NCS Healthcare, and American Pharmaceutical Services ("APS"), a subsidiary of Mariner Health Group, making it the nation's largest provider of pharmacy services to long-term care facilities, providing pharmacy services to an estimated 1,400,000 beds in long-term care facilities and other chronic care settings. Omnicare acquired APS from Mariner in 2002, Sunscript and NCS Healthcare in 2003, and NeighborCare, Inc. in 2005.  Upon information and belief, Omnicare is the successor-in-interest to APS, NCS Healthcare, and NeighborCare, and has assumed their rights, duties, and liabilities. Omnicare may be served through its registered agent, CSC – Lawyers Incorporating Service, 421 West Main, Frankfort, KY  40601.

27.     Defendant PharMerica, Inc. is a Delaware corporation whose principal business is providing pharmacy services to patients in long-term care settings.  PharMerica's principal place of business is at 1901 Campus Place, Louisville, Kentucky 40299.   PharMerica conducts extensive business in the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the City of Chicago.  PharMerica is one of the nation's largest long-term care pharmacy providers, specializing in the provision of pharmacy supplies and services to long-term care institutions.  In 1999, it provided pharmacy products and services to approximately 500,000 patients in long-term care and alternative settings, servicing an estimated 380,000 beds in skilled nursing facilities.  On April 26, 1999, Bergen Brunswig

acquired PharMerica, Inc. and PharMerica became a wholly-owned subsidiary of Bergen Brunswig. Bergen Brunswig then merged with AmeriSource Health Corporation on March 29, 2001 to form AmerisourceBergen. In 2006, AmerisourceBergen merged PharMerica with Kindred Healthcare Inc. to form PharMerica Long-Term Care, now headquartered in Louisville, Kentucky, allowing PharMerica to better compete with the nation's current giant of long-term care pharmacy services, Omnicare. PharMerica may be served through its registered agent, CSC-Lawyers Incorporating Service, 421 West Main, Frankfort, KY 40601.

### III.  RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

28.     Any and all acts alleged herein to have been committed by the Organon defendants were committed by officers, directors, employees, representatives or agents who at all times acted on behalf of their respective Organon defendant(s) and within the course and scope of their employment.

29.     The Organon defendants are related entities sharing common employees, offices and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

### IV.  SUCCESSOR LIABILITY

30.     Defendant Schering-Plough is the successor-in-interest to the Organon IBS defendants and has assumed their rights, duties, and liabilities. Schering Plough's purchase of the Organon IBS defendants has resulted in the substantial continuity of the Organon IBS defendants' business. For example, Schering Plough retained some of Organon USA, Inc.'s employees, including Carroll "Butch" McKenna, Director for Senior Care/Long Term Care for

Organon USA, Inc., and now a District Manager for Schering Plough, Mike Dziomba, Vice President of Fertility for Organon USA, Inc., and now Executive Director of Sales for Schering Plough, and members of Organon USA Inc's legal counsel, Fred Figa and Jon Beck, as a result of its purchase of the Organon IBS defendants.  In addition, Schering-Plough retained the Organon IBS defendants' production facilities, continued to produce the Organon IBS defendants' products, such as Remeron, and continued to use the Organon IBS defendants' name in conjunction with the Schering-Plough name.  As successor-in-interest to the Organon IBS defendants, Schering-Plough has assumed Organon's liabilities with respect to this suit.

31.     Defendant Merck is the successor-in-interest to the Organon IBS defendants and Schering-Plough and has assumed their rights, duties, and liabilities.  Merck's purchase of Schering-Plough has resulted in the substantial continuity of Schering-Plough and the Organon IBS defendants' business.  For example, upon information and belief, Merck retained some of Organon USA, Inc.'s employees, including Carroll "Butch" McKenna, Director for Senior Care/Long Term Care for Organon USA, Inc., and subsequently District Manager for Schering Plough, and members of Organon USA Inc's legal counsel, Fred Figa and Jon Beck, as a result of its purchase of Schering-Plough.  In addition, Merck retained the Organon IBS defendants' and Schering-Plough's production facilities and continued to produce the Organon IBS defendants and Schering-Plough's products, such as Remeron.  As successor-in-interest to Schering-Plough and the Organon IBS defendants, Merck has assumed Organon's liabilities with respect to this suit.

## V.     JURISDICTION AND VENUE

32.     Jurisdiction and venue are proper in this Court pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relators' claims seek remedies on behalf of the United States for

multiple violations of 31 U.S.C. § 3729 in the United States by all or any one of Defendants, some of which, upon information and belief, occurred in the Southern District of Texas and the District of Massachusetts, and because, based on information and belief, all or any one of Defendants transact other business within the Southern District of Texas and the District of Massachusetts.

33.    All defendants are subject to the general and specific personal jurisdiction of this Court.  Defendant Akzo Nobel is a large multinational group of companies, which engages in a variety of business activities, including developing, marketing, and selling pharmaceutical products throughout the United States and within the District of Massachusetts, all of which it accomplishes through its corporate center, business units, subsidiaries, officers, directors, employees, and agents.  Akzo Nobel has a two-layer organizational structure with a corporate center and business units in Pharmaceutical, Coatings, and Chemicals, which are generally organized by location, including companies operating throughout the United States.   The functions of the corporate center and the business units overlap.  Akzo Nobel's corporate center coordinates "key tasks" in areas such as finance, human resources, technology, legal matters, and intellectual property.  Akzo Nobel employees often rotated to and held positions at Organon USA, Inc.

34.    Furthermore, Organon USA, Inc., Organon International, Inc., and Organon Pharmaceuticals USA, Inc. were mere instrumentalities and/or agents of Akzo Nobel; without them Akzo Nobel would have been forced to perform their services itself.  In particular, Akzo Nobel exerted control over Organon USA, Inc.  For example, the Chief Executive Officer of Organon sat on the board for Akzo Nobel and reported directly to the Chief Executive Officer of Akzo Nobel.  Akzo Nobel and Organon employees often sat together on committees involving

14

marketing and production of pharmaceuticals.  The in-house legal counsel for Organon USA, Inc. received their salaries from Akzo Nobel.  In addition, Organon USA, Inc. senior management obtained approval from Akzo Nobel for the marketing budgets and strategic plans for its pharmaceuticals.  Organon USA, Inc. senior management was also required to obtain approval for any raises given to employees that exceeded ten percent.  As a result of Akzo Nobel's organizational structure, Akzo Nobel and Organon Biosciences N.V. have continuous and systematic contacts with the United States through their contacts with their American subsidiaries.

VI.    OVERVIEW OF MEDICAID, 340B AND OTHER FEDERAL HEALTHCARE PROGRAMS

A.    The Medicaid Program

35.    Medicaid was established by Title XIX of the Federal Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Program").  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

36.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  *See* 42 U.S.C. § 1396a.  The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

37.    The vast majority of states award contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States.

15

38.     The majority of long-term care residents are Medicaid patients.  Although long-term care residents often arrive at a nursing home with Medicare coverage, Medicare provides only a limited number of days of coverage.  Once those days are exhausted and the resident meets the required income level by depleting his or her savings, that resident becomes eligible for Medicaid, with its accompanying prescription benefit.  In the 1999 to 2005 time period, according to Organon, about 86% of nursing home residents were Medicaid-eligible, including those eligible under both Medicare and Medicaid.  In contrast, managed care and cash reimbursement in 1997 comprised only 14% of total long-term care revenue.  Medicaid thus dominated the long-term care segment of pharmaceutical sales until Medicare Part D commenced in January of 2006.

39.     LTCPPs, which are the entities that serve the pharmacy needs of these long-term care residents, specifically including Omnicare, PharMerica, NeighborCare, NCS Healthcare, American Pharmaceutical Services, and Sunscript, entered provider agreements with each of the state Medicaid programs to which they have submitted drug reimbursement claims.  These Medicaid provider agreements require LTCPPs to comply with all federal and state laws, including the federal Anti-Kickback Statute.

**B.      340B Covered Entities**

40.     The Public Health Service Act of 1992 established the Section 340B drug discount program.  42 U.S.C. § 256b.  Under the 340B program, drug manufacturers are required to provide statutorily defined discounts on outpatient drugs to "covered entities." "Manufacturers are required to participate in the 340B program as a condition of having drug charges reimbursed by Medicaid."  *County of Santa Clara v. Astra USA, Inc*., 2006 U.S. Dist. LEXIS 57176 (N.D. Cal. July 28, 2006).

16

41.     "Covered entities" mean federally qualified health center look-alike programs; certain disproportionate share hospitals owned by, or under contract with, state or local governments, and several categories of facilities or programs funded by federal grant dollars, including federally qualified health centers, AIDS drug assistance programs, hemophilia treatment centers, sexually transmitted disease ("STD") grant recipients, and family planning clinics.  42 U.S.C. § 256b.

### C.     Other Federal Purchasers

42.     Drug manufacturers are required to list their brand-name drugs on the Federal Supply Schedule to receive payment for the purchase of drugs by federal agencies and under the Medicaid program.  38 U.S.C. § 8126(a)(4).  The Department of Veterans Affairs negotiates Federal Supply Schedule contracts with pharmaceutical companies to establish the prices available for brand-name drugs to all direct federal purchasers, such as the Department of Defense, the Veterans' Administration, the Bureau of Prisons, and the Bureau of Indian Affairs.

### VII.     STATUTORY BACKGROUND

### A.     The False Claims Act

43.     For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides in pertinent part that:

(a) Any person who

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\*\*\*

> (7)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a).

44.    For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

> (a)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (except that this language applies to all claims pending on or after June 7, 2008)

> (c)    conspires to defraud the Government by committing a violation of the FCA;

> (d)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal material to an obligation to pay or transmit money or property to the Government

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a)(1).

**B.**    **The Federal Anti-Kickback Statute**

45.    The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service that is reimbursed by a federal healthcare program.  *See* 42 U.S.C. § 1320a-7b(b)(2).  "Remuneration" is broadly defined to include

anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program.  Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA.  *See* P.L. 111-148, § 6402, codified as 42 U.S.C. § 1320a-7b(g).

46.     The purpose of the Anti-Kickback Statute is to prohibit such improper remuneration, in order to secure proper medical treatment and referrals and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

47.     Paying kickbacks taints an entire prescription, regardless of the medical propriety of its use.  The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk.

## VIII.   OVERVIEW OF REMERON AND THE LONG-TERM CARE ARENA

### A.     Remeron: Regulatory History

48.     Organon launched Remeron Tablet in August of 1996 following FDA approval of the drug for the treatment of depression in adults.  The drug was billed as the first in a new class of anti-depressants called "noradrenergic and selective serotonergic anti-depressants" ("NaSA").  Remeron Tablet was manufactured in 15 mg, 30 mg, and 45 mg formulations, taken once a day.

49.     According to Organon's literature, Remeron Tablet has a dual-action effect that rectifies an imbalance of the brain chemicals noradrenaline and serotonin, both of which are believed to be involved in causing depression.  Remeron Tablet is believed to exert its therapeutic effects by increasing the release of both of these neurotransmitters from nerve cells in

the brain, thereby correcting the deficiencies and relieving depressive symptoms such as depressed mood.

50.     Organon's patent for Remeron Tablet, first issued in 1977, expired on June 14, 1998, with generic manufacturers expected to enter the market as early as May 2001.  Organon's managers saw the expiration of Remeron Tablet's patent as a potentially cataclysmic event for the company, likely resulting in significant layoffs.  As Remeron SolTab was launched in 2001 in the hopes of maintaining Organon's Remeron market share in the face of generic competitors, and anxiety rose among Remeron managers, the company's culture increasingly supported a willingness to preserve Remeron business, whatever the means.

51.     Organon undertook two actions to prevent the perceived disaster.  First, on November 2, 1999, Organon obtained a new patent that purported to claim a combination therapy of mirtazapine together with a selective serotonin reuptake inhibitor ("SSRI"), which effectively blocked generic competitors' entry to the marketplace until February of 2003.  A patent infringement suit and a related case against Organon brought by generic manufacturers ensued, with the latter case finally settling in August of 2005.

52.     Second, Organon submitted a new drug application to the FDA for a variant form of Remeron: an orally disintegrating tablet called Remeron SolTab, available in the same dosages as the tablets.  Organon trumpeted Remeron SolTab as improving "patient compliance," particularly in long-term care, because it could be administered without water.  The FDA approved the new Remeron product on January 12, 2001.  Because Remeron SolTab was not initially rated as AB equivalent to Remeron Tablet, generic competitors were barred from manufacturing a similar mirtazapine orally-disintegrating tablet.  Organon's creation of Remeron SolTab made it possible to not only maintain market share through conversion to the patent-

protected product, but to continue to expand the business.   At the core of Organon's brand strategy for Remeron after the launch of Remeron Soltab was the achievement of those twin goals through a bevy of illegal kickbacks of different kinds.

### B.        Remeron Sales to Long-Term Care

53.     Remeron has never been among those anti-depressants that have attained "household name" status such as Prozac, Paxil, or Zoloft.  Its selling points—a short half-life and unproven, unapproved claims of avoidance of side effects such as insomnia and anxiety—had apparently not proved compelling enough to health care providers at large.  Remeron, however, has had one, very lucrative niche: *long-term care*.  While Remeron products made up less than 5% of the overall market share for anti-depressants during the relevant period, they made up 15% percent of anti-depressant sales to long-term care pharmacies—a three-fold increase in market share.   From 2000 to 2004, as much as 35% of Remeron's total sales were derived from prescriptions for residents of long-term care facilities.  These pharmacies had powerful financial reasons to prefer Remeron, as described below.

54.     As Organon noted in its 2000 Training Manual for Long Term Care ("LTC Sales Manual"), in recent years the senior care marketplace has been the fastest-growing segment of the healthcare industry for pharmaceutical sales, as the growing elderly population has created a rapidly rising demand for long-term care services.

55.     Most "skilled nursing facilities," or nursing homes, contract with "long-term care pharmacy providers" ("LTCPPs"),[2] which are institutional pharmacies specializing in the skilled nursing facility ("SNF") market.   Some nursing homes have their own in-house pharmacies, while many others contract with nationwide corporate pharmacy providers.   In 1999, as

---

[2]        Organon refers to long term care pharmacies such as PharMerica as "pharmacy providers," and thus uses the acronym "LTCPP," but they are also known as "LTCPs," long term care pharmacies.

Organon's LTC Sales Manual explained, the top five corporate long-term care pharmacy providers accounted for over 50% of all U.S. nursing home residents:

| Company | Number of SNF Beds Serviced |
|---|---|
| Omnicare | 578,000 |
| PharMerica | 380,000 |
| NeighborCare | 248,000 |
| NCS | 248,000 |
| Living Centers of America | 101,000 |

56.    By 2001, according to a Remeron business plan authored by Organon managers John Maddox and Butch McKenna ("Business Plan"), the seven largest LTCPPs accounted for almost 77% of skilled nursing facilities and 72% of total skilled nursing facility beds:

| LTCPP | # SNFs | # Beds | # SNFs | # Beds | % SNFs | % Beds |
|---|---|---|---|---|---|---|
| NeighborCare | 2,100 | 211,500 | 17,176 | 1,848,293 | 12.2% | 11.4% |
| PharMerica | 2,850 | 287,760 | 17,176 | 1,848,293 | 16.6% | 15.6% |
| Omnicare | 5,000 | 495,000 | 17,176 | 1,848,293 | 29.1% | 26.8% |
| NCS | 1,875 | 188,100 | 17,176 | 1,848,293 | 10.9% | 10.2% |
| APS | 430 | 50,000 | 17,176 | 1,848,293 | 2.5% | 2.7% |
| Vencare | 325 | 32,000 | 17,176 | 1,848,293 | 1.9% | 1.7% |
| Sunscript | 600 | 56,800 | 17,176 | 1,848,293 | 3.5% | 3.1% |
| **TOTAL** | **13,180** | **1,321,160** | **17,176** | **1,848,293** | **76.7%** | **71.5%** |

57.    In order to buy the drugs they disburse to residents, long-term care pharmacies generally contract with one of the following: (1) a long-term care buying group; (2) a group purchasing organization ("GPO"); or (3) the pharmaceutical company itself.  Among the most prominent GPOs are Managed Healthcare Associates, Inc. ("MHA"), based in East Hanover, New Jersey, GeriMed, based in Louisville, Kentucky, and Committed Provider Services, an alliance between Bergen Brunswig Drug Company, NCS Healthcare, and Tenet BuyPower. Together, in 2001, these GPOs represented over 90% of Remeron Tablet and Remeron SolTab prescriptions filled in long-term care.  By 2000, however, Organon had begun the process of

negotiating direct contracts with the largest long-term care pharmacy providers—PharMerica, Omnicare, NCS Healthcare, NeighborCare, APS and Sunscript, as described in Section IX.

IX.     ORGANON'S SCHEME TO DEFRAUD MEDICAID BY OFFERING FINANCIAL INDUCEMENTS TO LONG-TERM CARE PHARMACY PROVIDERS TO PURCHASE AND RECOMMEND REMERON TABLET AND REMERON SOLTAB

   A.     Organon's Kickbacks to Long-Term Care Pharmacy Providers from 1999 to 2000

   58.     Carroll "Butch" McKenna, Director for Senior Care/Long Term Care, and John Maddox, Manager for Senior Care/Long Term Care, both within Organon's National Accounts Division, handled much of the contracting with the large long-term care chains and pharmacy managers.  McKenna later disclosed to Relator Banigan in a private conversation that, beginning in 1999, Remeron Tablet sales were driven in large part by market share discounts and rebates meant to induce pharmacies to recommend Remeron over competitors, regardless of physician recommendations.

   59.     Beginning in late 1999, Organon entrusted the marketing of Remeron in the long-term care sector and the negotiation of long-term contracts with long-term care pharmacy providers—not to its normal sales force of about 500 Remeron sales representatives, but to a special, more discreet group of about twenty regional account managers specializing in long-term care, called Long Term Care Sales Specialists or Senior Care Regional Account Managers ("SCRAMs").  In fact, normal field representatives were not permitted to call on long-term care facilities at all.  Long-term contracts arising out of this specialized sales force's calls were approved by a contract review committee, which was chaired by the Vice President of Marketing and the Executive Director of Managed Markets, both of whom were members of Organon's Executive Leadership Team.

60.     Until 1999, Organon negotiated only modest discounts, with 2% going to long-term care members of the GPOs and another 2% to 3% in administrative fees paid to the GPOs based on members' Remeron purchases.  These discounts arguably fell under a limited Anti-Kickback Statute exemption for small, fixed GPO discounts.  *See* 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952(j).

61.     In 1999, in addition to GPOs' relatively modest discounts, Organon began offering Remeron contract terms that included much larger discounts and rebates of various kinds on Remeron Tablet applicable only to the long-term care pharmacy provider members of these GPOs.  Organon executives hoped that running the contracts through the GPOs would shield the kickbacks from the government's disapproval of financial incentives to pharmacies.

62.     Organon's 1999 and 2000 contracts with the most prominent GPOs, such as GeriMed, Managed Healthcare Associates, Owen and Committed Provider Services, provided long-term care pharmacy provider members with **8% to 14.8% "ramp-up" charge-back discounts** for the first five months, followed by **8% to 15% chargeback discounts** after that, depending on the market share held by Remeron Tablet for that member of the GPO.  These market-tier discounts were based on the performance of individual long-term care pharmacy providers, not the performance of the GPO as a whole.  In exchange for these discounts, Organon required the long-term care pharmacy providers to promote Remeron Tablets to their individual pharmacies.  This scheme was highly successful; long-term sales increased, making Remeron Organon's largest-selling product. These contracts remained in place until the beginning of 2001, when Organon began entering into contracts directly with long-term pharmacy providers, except for NeighborCare and NCS Healthcare, bypassing the GPOs.

63.     Organon singled out long-term care pharmacies for discounts because long-term care pharmacies wield a powerful influence over the choice of drugs used in long-term care facilities.  Upon entering a nursing home, a resident generally severs his or her ties to a family physician and falls under the care of a physician responsible for the particular facility, who generally visits the facility every thirty days.  Nurses and other facility staff who see the patient daily become the physician's influential "eyes and ears," in close consultation with the pharmacy's consultant pharmacist and clinical pharmacy staff.

64.     Because long-term care pharmacy providers could exert considerable control over the drugs prescribed to nursing home residents, Organon, in marketing drugs in the long-term care arena from 2000 to at least 2004, focused on "key decision-makers" within each long-term care pharmacy provider, such as regionally-based clinical staff, consultant pharmacists, Directors of Pharmacy Operations, or Purchasing Directors, rather than physicians.

65.     Organon put it this way in its LTC Sales Manual:

> Field sales personnel have traditionally focused primarily on direct physician interaction.  Now, successful sales calls in the long-term care market include other important decision-makers who may influence physician prescribing practices.  These include pharmacy provider personnel, consultant pharmacists, nurses, medical directors, and SNF administrators.  Your knowledge of the long-term care market and the roles and responsibilities of key decision-makers will give you a competitive advantage.

**B.      Organon's 2000 to 2005 Scheme to Defraud Medicaid by Offering Kickbacks to Long-Term Care Pharmacy Providers**

66.     In mid-2000, in anticipation of the Remeron SolTab launch in January 2001, Organon executives began collecting detailed data about competitors' pricing and developing a campaign to convince LTCPP's to embrace the new drug and help drive conversion from Tablet to SolTab, as well as expand market share.  In carrying out this research, executives realized that Organon was well-positioned to market the "opportunity to profit" from Medicaid on Remeron

SolTab.  Remeron SolTab was set to be priced to be less expensive than many anti-depressants.

Indeed, Zoloft was one of the few name-brand anti-depressants with a lower price.  With

anticipated rebates available to long-term care customers factored in, Remeron could boast a

superior Medicaid reimbursement to long-term care pharmacies.

67.     With that powerful financial incentive in their tool belt, Organon executives

prepared for the first time to negotiate full-blown therapeutic interchange programs with all of

the major LTCPPs.  That year they prepared a LTC Sales Manual, which instructed Organon's

LTC sales force that long-term care pharmacy providers work directly with regional long-term

care consultant pharmacists and medical directors to set up such therapeutic interchange and

switch programs "in an effort to contain costs and maximize profits."

68.     What pharmacy providers cared about, Organon assured its sales force, was a

pharmaceutical product's "spread," and its effect on "maximiz[ing] profit."  LTC Sales Manual.

"Spread may be a critical component in selecting preferred products within a therapeutic

category," Organon noted in its LTC Sales Manual.

69.     The LTC Sales Manual also explained to sales representatives that "enhancements

may be used to win favorable contracts with providers," including up-front discounts and

"rebates contracts based on segment-share performance."   The LTC Sales Manual noted that

"value-added programs and services may be offered to enhance the interactions between

pharmacy providers and their SNF customers," such as educational symposia for physicians and

nurses, pharmacy in-services programs, market research, clinical research, support for clinical

programs and therapeutic  interchange programs.

70.     "Therapeutic interchange" and "switch" programs can operate in different ways

and bear different labels, but in essence, a long-term pharmacy has several devices at its disposal

26

for affecting a change in drug choice among its patients.  In "collateral practice" states, it can ask physicians serving its patients to sign agreements ceding their authority to choose what drug will be prescribed within a particular class.  Where collateral practice is not permitted, it can attempt to persuade physicians to write new prescriptions to move patients to the preferred drug, or, under either legal or illegal circumstances, it can simply set up its computer system so that only the preferred drug may be dispensed by the pharmacist.  The latter device is often called an "NDC lock."  When an NDC lock blocks a drug from being dispensed, a pharmacist must obtain a new prescription for a drug that is not blocked.  This usually must be done quickly because a patient is likely in danger of missing a dose.  When the pharmacist fails to immediately obtain that prescription, the risk that the pharmacist or others will falsify a prescription, potentially with the company's approval, runs high.

71.     In any case, therapeutic interchange and switch programs sponsored by pharmaceutical manufacturers put long-term care facility patients at risk for serious health issues. All medications within a therapeutic class are not created equally.  Each drug affects each patient differently based on a multitude of factors, including other medications a patient is currently taking and other conditions that the patient may have.  What is the "preferred" drug of choice from a physician's standpoint may not be the same as the drug chosen by a long-term care pharmacy provider to be the provider's "preferred" drug within a therapeutic class.  The American Medical Association has stated that "switching of therapeutic alternates in patients with chronic disease who are stabilized on a drug therapy regimen should be discouraged." AMA Policy H-125.991(2).   This is particularly true in the case of long-term care patients, the majority of whom are elderly and have been on the same medications for years.  Moreover, switching patients' medications often requires pharmacists to convert dosages as the medications

usually come in different dosage forms. This conversion is not an exact science, leaving room for the possibility that a patient may receive too little or too much medication as a result of the change.

72.     Engaging in active therapeutic interchange programs that switch elderly long-term care patients from a competitor anti-depressant poses a risk of harm for these patients.  The FDA-approved labeling for both drugs includes warnings that use of Remeron and Remeron SolTab may result in somnolence (drowsiness), increased appetite or weight gain, and even anxiety.  The FDA-approved labeling for Remeron SolTab also notes that caution should be used in treating geriatric patients with Remeron SolTab because elderly patients often have decreased renal function making it less likely to rid their bodies of the drug.  The labeling further advises that sedating drugs, like Remeron SolTab, may "cause confusion and over-sedation in the elderly."  Thus, switching an elderly patient to Remeron for the sake of financial rather than clinical concerns exposes that patient to potential harm.  Where the financial benefit comes out of Medicaid's pockets rather than any true cost savings, "therapeutic interchange" is unscrupulous as well.

73.     Nevertheless, in late 2000, Organon began negotiating directly with the largest long-term care pharmacy providers—PharMerica, Omnicare, NeighborCare, NCS Healthcare and Sunscript.  In addition to the market-share discounts and rebates, Organon offered these providers new incentives—a "conversion rebate" up to 3% for converting prescriptions from Remeron Tablet to Remeron SolTab and a "1.5% therapeutic interchange bonus" for making Remeron "preferred" and instituting an active therapeutic interchange program that encouraged changing prescriptions from competitor antidepressants to Remeron Tablet and upon launch to Remeron SolTab.

28

74.     Then, after Remeron SolTab's launch, Organon began reducing discounts and rebates on Remeron Tablet and offered extra incentives to convert prescriptions from the old to the new Remeron product, including a "conversion rebate" and a "therapeutic interchange bonus."   At this time, Organon shifted its contracting strategy, moving toward contracting directly with long-term care pharmacy providers.  As the Business Plan demonstrates, Organon planned to use some of the money from the eliminated administrative GPO fees to fund its illegal kickback scheme.    *See, e.g.,* "Business/Strategic Plan" ("Business Plan"), Ex. 2, p. 12. Organon's direct contracting campaign was highly successful, although at least one long-term care pharmacy provider, NCS Healthcare, preferred to continue contracting through GPOs.

75.     In addition, Organon increasingly moved away from price discounts, which benefit the purchaser at the time of purchase, and toward rebates, which are paid back to the purchaser later and thus are not revealed in the invoice.  Organon LTC leadership requested the shift; Long Term Sales management Butch McKenna and John Maddox explained to their superiors that their long-term care customers preferred rebates over discounts as their Medicaid contracts were quickly transitioning from Average Wholesale Price ("AWP")-based reimbursement to Estimated Acquisition Cost (EAC).  Under EAC regimes, Medicaid states would frequently request disclosure of pharmacists' actual contracts on claims for reimbursement.  Because rebate payments could be calculated only after the fact and rebate amounts did not appear in the parties' purchase invoice, long-term care pharmacy providers were able to hide their actual acquisition costs from state Medicaid agencies by moving from discount to rebate.  McKenna referenced the need to transition to rebate payments in his 2001 Business Plan, stating:  "States are undergoing major changes in Medicaid reimbursement which can

affect Remeron SolTab sales.  Contract strategy may need changing due to states going from AWP to Acquisition costs."

76.     A February 1, 2002 internal Organon memorandum from John Ocejo to Sam Michini summed up the contract changes contained in new agreements that had recently been negotiated with three of the four GPOs:

- Aggressive ramp-ups that applied only to Remeron SolTab;
- All Remeron Tablet incentives were eliminated, including the administrative fee;
- An increased administrative fee on Remeron SolTab;
- Financial incentives changed from predominantly discounts with a small added rebate to mainly rebates with a small discount; and
- Market tier rebates that demanded high market share and conversion rates to maintain the same price as during ramp-up.

77.     Organon also enticed long-term care pharmacy providers to purchase and recommend Remeron Tablet and Remeron SolTab by offering kickbacks in various forms, including data sharing agreements, research and educational grants, sponsorship of annual meetings and continuing education programs, payments for advertising initiatives, offers of nominally-priced Remeron product, entertainment, gifts and other inducements.

78.     In exchange for all of these incentives, Organon offered (1) the fullest possible "therapeutic interchange" programs to expand Remeron's market share compared with other anti-depressants on formulary; and (2) conversion programs aimed at converting Remeron Tablet prescriptions to Remeron SolTab prescriptions.  Such initiatives could include "educational" programs targeting consultant pharmacists such as newsletters and in-services, internal advertising, letter-writing campaigns to physicians seeking authority to change prescriptions, and systems-based initiatives up to and including NDC locks.  On an LTCPP-by-LTCPP basis, Organon was able to win commitments to undertake many of these promotional efforts,

especially with regard to conversion, driving significant sales that would not have occurred if Remeron's clinical attributes had been determinative. Long-term sales continued to increase steadily with the implementation of this scheme, maintaining Remeron's status as Organon's single largest-selling product.

### C.        Marketing Strategies and Tools

79.        In selling the long-term care pharmacy providers' "opportunity to profit" through market share rebates and discounts, conversion rebates and a bonus for actively engaging in a therapeutic interchange program, the sales team used various tools to help them, including a notebook entitled "Remeron SolTab Therapeutic Interchange Toolkit," accompanied by branded PowerPoint presentation and financial modeling tools meant to calculate to what extent long-term care pharmacy providers could enrich themselves by increasing the number of Remeron prescriptions they filled. Some of these important tools are described in more detail below.

### i.        2001 Business Plan for Selling Remeron to Long-Term Care

80.        In early 2001, just as Remeron SolTab was launched, Carroll "Butch" McKenna, Director for Senior Care/Long Term Care, and John Maddox, Manager for Senior Care/Long Term Care, within the National Accounts Division, eager to convert Remeron Tablet market share in the Long Term Care segment to Remeron SolTab, created a "Business/Strategic Plan" ("Business Plan"). *See* Ex. 2. That plan described Remeron's long-term care market share, main competitors, and main customers, discussed Medicaid as the major payor in this segment, and set the goal of converting 60% of Remeron prescriptions in the long-term care segment to Remeron SolTab by April 1, 2002, while simultaneously increasing overall Remeron sales by 20%. Business Plan, Ex. 2, p. 5. The Business Plan laid out charts listing specific strategies for accomplishing those goals with regard to major customers Omnicare, PharMerica,

NeighborCare, NCS Healthcare, Sunscript, Owen, MHA, and GeriMed, including specific ways to funnel money to these customers in exchange for increasing Remeron conversion and/or implementing a therapeutic exchange program.

81.     The Business Plan reveals that Organon long-term care managers were aware that Medicaid was the dominant payor for most long-term care Remeron prescriptions in that area of health care, and purposefully marketed to pharmacies the profits to be made from Medicaid reimbursement at Medicaid's expense.  The Business Plan noted, for instance:

> States are undergoing major changes in Medicaid reimbursement which can affect
> Remeron SolTab sales.  Contract strategy may need changing due to states going
> from AWP to Acquisition costs.

Business Plan, Ex. 2, p. 4.  This aspect of the business plan coincided with Organon's shift to off-invoice rebates.

82.     In addition, the Business Plan named as one strategy to implement that Organon LTC sales representatives be trained to use a "Profit Calculator" to show pharmacies their potential profit from Remeron prescriptions.  Business Plan, Ex. 2, p. 6.  Further, the Business Plan demonstrates the involvement in the Medicaid scheme of high-level Organon management and teams including Legal and Contract Development, all to be repeatedly consulted in developing strategies for selling Remeron to long-term care pharmacy providers.  Business Plan, Ex. 2, p. 5.

83.     Another strategy proposed in the Business Plan was the creation of materials to assist long-term care pharmacy providers to implement a "therapeutic interchange" to replace prescribed drugs with Remeron Tablet and, after its launch, to Remeron SolTab, and to implement programs aimed at converting Remeron Tablet prescriptions and other antidepressant prescriptions to Remeron SolTab prescriptions.  Business Plan, Ex. 2, p. 7.  The proof that

Organon management did indeed approve McKenna's and Maddox's business plan is the finished therapeutic interchange "Toolkit" itself, which is described below.

### ii.      The "Remeron SolTab Therapeutic Interchange Toolkit"

84.      It was after Remeron SolTab was launched in January 2001 that Organon's Marketing Department hired pharmacist Dana Saffel to speak as a paid consultant covering both clinical and financial topics.   As a part of her employment, Saffel also designed formal marketing materials targeting long-term care pharmacy providers' "opportunity to profit" from Organon's "attractive market share-based contract" with rebates for conversion and implementation of therapeutic interchange program for Remeron SolTab.  The notebook that she helped to create, "Remeron SolTab Therapeutic Interchange Toolkit" ("Toolkit") and its accompanying CD and "Profit Calculator," makes visible and undeniable Organon's marketing practices.  It is the "smoking gun" that demonstrates beyond any doubt that Organon specifically marketed to long-term care pharmacy providers the opportunity to profit illegally from Remeron prescriptions at Medicaid's expense.  In 2006, when the advent of prescription eligibility under Medicare Part D finally rendered such marketing obsolete, Organon management was eager to bury such evidence of its longtime marketing practices in long-term care.  Relators nevertheless obtained a copy of the notebook, previously attached as Exhibit 1 to Relators' Original Complaint.  Relators specifically retain and adopt Exhibit 1 from Relators' Original Complaint and incorporate it in this Third Amended Complaint for all purposes.

85.      These printed materials were widely used by the Organon Long Term Care sales force as the primary tool for selling to both long-term care clinicians and long-term care pharmacy consultants.  Dana Saffel's cover letter to the notebook made plain that the Toolkit was designed, not to be used by Organon salespeople, but to be used by long-term care pharmacy

providers themselves in driving conversion and implementing a therapeutic interchange program. The cover letter named two purposes for the notebook: to persuade the pharmacy provider why it should choose Remeron SolTab as its "preferred anti-depressant agent for a large percentage of your frail elderly patients," and to teach the pharmacy provider how to "implement a therapeutic interchange program" that would successfully promote the preferred drug to patients' prescribers.  Toolkit, Ex. 1, Cover Letter, p. 1.

> **a.**     **Organon's Toolkit Promoted Remeron's Sedative Qualities and Convenience for LTC Administrators in the Name of "Therapeutic Efficacy"**

86.     Section I of the Toolkit was devoted to Remeron's "therapeutic efficacy," aimed at providing long-term care pharmacy providers with purported scientific and medical reasons to justify Remeron as preferable to other antidepressants, even though Organon's representations about Remeron's therapeutic efficacy, such as Remeron's sedative, anti-anxiety and weight gain qualities, were false, misleading and amounted to off-label promotion.  In addition to discussing Remeron's pharmacological properties, the section discussed costs to Medicaid and convenience in administering and storing the drug.  For example, on page 41, the Toolkit suggested that the "most appropriate" anti-depressant for nursing home resident is one that, among other qualities, "improve[s] reimbursement under PPS" for the resident's care by elevating the patient's reimbursement level and "reduce[s] staff time required for care."

> **b.**     **Organon's Toolkit Advised LTC Customers to Adopt Remeron as Their Preferred Anti-Depressant Based First and Foremost on Their Opportunity to Profit at Medicaid's Expense**

87.     Section II of the Toolkit, entitled "Contract Evaluation," spelled out the bottom line for pharmacy providers: the opportunity to increase profits by encouraging the prescribing of Remeron.  This section, focused on pharmacy providers' "Opportunity to Profit" based on the

"spread" and the rebates and discounts offered.  In addition, the manual was accompanied by a branded electronic diskette titled with the same name ("Toolkit CD") that housed a financial model meant to encourage long-term care customers to calculate their profit even more easily.

        **c.**       **Organon's Toolkit Showed LTC Customers Exactly How to Control Which Anti-Depressant Was Prescribed to Their Disabled and Elderly Patients**

88.     Organon hired pharmacist Dana Saffel for the specific purpose of developing a set of materials for pharmacy providers to use to convert prescriptions to Remeron SolTab from both Remeron Tablet and other anti-depressants.  Section III of the Toolkit includes step-by-step directions for "implementing a therapeutic interchange" using both the Remeron drug information in Section I, in addition to a full portfolio of materials she developed for that purpose.  These materials were also included on the accompanying CD as templates.

89.     The Toolkit CD advised that a pharmacy could reach the maximum market share attainable for a preferred drug in three to six months.  It laid out a timeline that began with planning and moved on to physician notification, "point-of-disbursing intervention," and monitoring.  As the Toolkit CD pointed out, converting prescriptions is simple under a "collaborative practice agreement," in which a physician broadly authorizes a pharmacist to initiate, change, discontinue, and/or monitor patient medications.  Some long-term care facilities incorporate such an agreement into their policies and procedures.  Where this exists in its broadest form, the only communication to a physician is a notification of the change.

90.     As an alternative, the Toolkit CD suggested a subtler method for obtaining physician authorization.  In a typical long-term care facility, a physician signs orders for his or her patients on a monthly basis.  The Toolkit recommended including a broad "authorization phrase" on this Physician's Order Summary such as:

"May use alternate dosage form of ordered drug if necessary and appropriate" (would allow conversion from Remeron Tablet to Remeron SolTab);
or
"May perform therapeutic interchange on appropriate drugs per facility policy" (even broader)

That way, the Toolkit CD suggested, "[o]nce the physician has signed the monthly orders, he has authorized the activity."

91.    The Toolkit CD included these template "tools" for increasing Remeron SolTab's market share:

- **Introductory letter to physicians:** Extols virtues of Remeron, with attached chart of applicable patients and authorization and clinical studies.

- **Memorandum to facility administrators announcing Remeron SolTab as preferred drug:** Focusing on efficiency, convenience, regulatory issues, states that pharmacy "will be identifying those residents who may benefit from Remeron SolTab as we visit your facility and will be making appropriate recommendations to the attending physician."

- **Announcement to Facility Staff:** States that "[a]ll Remeron orders will be converted to this new and easy to administer dosage form."

- **Several example prescriptions to insert in consulting pharmacists' patient-specific recommendations:** To move resident to Remeron SolTab from Remeron Tablet or other anti-depressants.  For different indications, including swallowing problem, anxiety, weight loss, insomnia, "administrator's slant" and "director of nursing slant."  The Toolkit CD suggested adding boxes for yes or no for the physician to check.

- **Point-of-disbursing intervention forms:**  "Clinical alerts" to send to physicians when a refill order is received or when a physician defies earlier requests and writes a new prescription for a non-preferred drug, asking for permission to convert the prescription to Remeron SolTab.  The Toolkit CD also recommended at this point calling facility staff to win their support, then calling the physician.

92.     In Section III, the Toolkit actually hypothesized that, if five pharmacists each spent one overtime day calling 11 physicians an hour, spending five minutes on each call, they could convert 444 prescriptions at labor costs of only $2,500 and still save over $56,000 every month by converting to Remeron SolTab.

93.     The Toolkit makes abundantly clear just how much influence pharmacists have over what product is prescribed to long-term care residents of their facilities, and just how much profit is at stake when they wield that influence.

**D.     Organon's Offer of and Long-Term Care Pharmacy Providers' Solicitation of Kickbacks**

94.     From 1999 through 2005, to expand and maintain its market share for its drugs Remeron and Remeron SolTab, Organon offered kickbacks in various forms to LTCPPs, such as PharMerica, Omnicare, NeighborCare, NCS Healthcare, APS, and Sunscript, all for the purpose of inducing LTCPPs to purchase Remeron Tablet and Remeron SolTab and often in exchange for bestowing Remeron Tablet and Remeron SolTab with a "preferred" status and engaging in an active therapeutic interchange program.   For example, Organon offered deep discounts and rebates on Remeron and Remeron SolTab, such as ramp-up discounts, market share discounts and rebates, "conversion" rebates, and "therapeutic interchange" bonuses.   Organon's kickbacks also took the form of data sharing agreements for the purchase of LTCPP prescribing data, research grants, educational grants, access fees, sponsorship of long-term care pharmacy providers' annual meetings, advisory panels, and other forms of remuneration. All of these financial incentives were done at the expense of Medicaid and other federal healthcare programs.

**i.     PharMerica**

95.     PharMerica is one of the nation's largest long-term care pharmacy providers and Organon's largest customer.  In 1999, Organon contracted directly with PharMerica, providing

an initial discount of 5% for the first five months of the contract period, followed by 2% to 9% discounts after that, dependent on Remeron's market share for that member.  Ex. 3 (February 1999 Long Term Care Purchase Agreement between PharMerica and Organon).  In late 2000, anticipating FDA approval of Remeron SolTab, Organon approached Bergen Committed Provider Services, a GPO of which PharMerica was a member, to negotiate a contract for the purchase of Remeron Tablet and Remeron SolTab by PharMerica.  Ex. 4 (January 2001 GPO Purchase Agreement between Organon and Committed Provider Services).  Organon offered a **12% ramp-up discount through September 30, 2001 and a 5% to 12% chargeback discount** after that based on market tier.  *Id.*  The contract also included a **1.5% therapeutic interchange bonus** for switching prescriptions to Remeron Tablet or Remeron SolTab **and a conversion rebate of up to 3%** for prescriptions converted from Remeron Tablet to Remeron SolTab, both of which offers were made available only to long-term care members of Committed Provider Services.  *Id.*  Upon information and belief, PharMerica agreed to give Remeron "preferred" status and implement a therapeutic interchange program.

96.    In March 2002, Organon contracted directly with PharMerica, changing the discounts to rebates.  Ex. 5 (March 2002 Long Term Care Purchase Agreement between Organon and PharMerica).  The March 2002 contract increased the ramp-up rebate to 14% and extended this rebate through September 30, 2002.  *Id.*  In June 2002, Organon and PharMerica amended the contract to add a conversion rebate.  PharMerica could earn up to 10% of its Remeron Tablet purchases if its Remeron SolTab purchases comprised at least 90% of its total Remeron purchases, and 8% of its Remeron Tablet purchases if its Remeron SolTab purchases comprised between 80% to 89% of its total Remeron purchases.  Ex. 6 (June 2002 Amendment to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica).

97.     Through several contract amendments, Organon continued to offer the 14% ramp-up rebates, conversion rebates, therapeutic bonuses, and market-share rebates in various forms to PharMerica until December 31, 2005.  *See*, *e.g.*, Ex. 7 (October 2002 Amendment to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica); Ex. 8 (January 2003 Amendment to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica, amending conversion rebates to 8% to 10%); Ex. 9 (January 2003 to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica, amending rebates based on market share to 4% to 16%); Ex. 10 (October 2003 Amendment to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica, extending ramp-up and amending rebates based on market shares to 6% to 17.5%); Ex. 11 (January 2004 Amendment to March 2002 Long Term Care Purchase Agreement between Organon and PharMerica, moving to "benchmark" mechanism for determining rebates).   Organon pricing data for PharMerica demonstrates that PharMerica received these rebates until 2005.  *See*, *e.g.*, Ex. 12 (Third Quarter 2003 Data Showing Rebates to PharMerica from Organon for Remeron products); Ex. 13 (Fourth Quarter 2003 Data Showing Rebates to PharMerica from Organon for Remeron products); Ex. 14 (Organon Trend Report Showing Sales and Rebates to PharMerica from Organon for Remeron products from Second Quarter 2003 through Fourth Quarter 2004); Ex. 15 (First Quarter 2005 Data Showing Sales and Rebates to PharMerica from Organon for Remeron products).

98.     In 2001, in addition to offering kickbacks in the form of market-share discounts and rebates, conversion rebates, and therapeutic interchange bonuses to PharMerica, Organon offered other kickbacks to PharMerica in various forms in exchange for pushing conversion of Remeron Tablet prescriptions to Remeron SolTab prescriptions and implementing a therapeutic

interchange program.  These kickbacks included, but were not limited to, data sharing or data purchasing agreement, meeting sponsorships, in-service programs, advisory boards, offers of nominally-priced Remeron SolTab, advertising initiatives, entertainment, gifts, and other inducements.  For example, the 2001 Business Plan proposed by Maddox and McKenna recommended budgeting for data purchase from PharMerica, noting that "Purchasing data and increasing level of Support is helping … convert and increase utilization of Remeron SolTab." Business Plan, Ex. 2, pp. 10-12.  The 2001 Business Plan also set aside money for educational mailings, providing educational and clinical services, in-service programs, $15,000 to sponsor PharMerica's annual meeting, conversion letters, inclusion in advertising boards, mailings, letters and conference calls.  Business Plan, Ex. 2, pp. 10-12.

99.    In late 2000 and early 2001, once Organon expressed interest in therapeutic interchange and a willingness to back up the commitment with cash, PharMerica actively pursued Organon to participate in its Vendor in Partnership ("VIP") program, which was little more than a conduit to funnel money to PharMerica in exchange for Remeron prescriptions. PharMerica used the program as an internal ranking system to reward pharmaceutical manufacturers, including Organon.  PharMerica ranked pharmaceutical manufacturers according to the amount of "rebate discounts" on their drugs and the amount of "contributions" (essentially cash gifts) these companies made to the vendor in partnership ("VIP") program at PharMerica. The VIP program had different levels of achievement, with Diamond Level being the highest a company could reach.  In order to reach Diamond Level, a pharmaceutical company would have to contribute at least $150,000 per product to the VIP program.  With recognition in the VIP program, a pharmaceutical company would receive additional support from PharMerica in implementing therapeutic interchange programs and other sales initiatives.

100.    PharMerica would also choose a Vendor of the Year from the various high-ranking pharmaceutical manufacturers participating in the VIP program.  Although Organon was a small player and had only two products in the long-term care market, Remeron Tablet and Remeron SolTab, while other pharmaceutical companies, such as Pfizer or Bristol-Myers Squibb, had several products, Organon was ranked Vendor of the Year in 2002 at PharMerica. Organon also achieved Diamond Level in 2002, meaning that it provided in excess of $150,000 for both Remeron Tablet and Remeron SolTab.

101.    In addition to providing kickbacks in exchange for therapeutic interchange, Organon offered PharMerica nominally-priced Remeron in exchange for future business.  While performing his normal job duties, Relator Banigan discovered that in the third quarter of 2001, Organon offered PharMerica a large amount of Remeron SolTab at a nominal price in order to dispose of Remeron SolTab that would expire quickly in exchange for the purchase of the same amount of Remeron SolTab at regular contracted prices.

### ii.    Omnicare

102.    In February 1999, Organon contracted with Managed Healthcare Associates ("MHA"), a GPO, of which Omnicare was a member.  Organon's February 17, 1999 contract with MHA pledged **ramp-up discounts of 14.8, followed by 8% to 15% discounts based on market tier in the post ramp-up period**.  Ex. 16 (February 1999 GPO Purchase Agreement between Organon and MHA).  Even in 1999, such discounts were offered only to the GPO's long-term care members like Omnicare.  *Id*.  Omnicare also received the advantage of a similar contract between Organon and GeriMed, another GPO of which Omnicare was a member.  Ex. 17 (March 1999 GPO Purchase Agreement between Organon and GeriMed).

103.    In February 2001, just as Remeron SolTab was launched, MHA and Organon signed a new agreement, which instituted new promotion requirements, **"therapeutic interchange bonuses"** for Remeron, and **"conversion rebates"** applying only to the new Remeron product.   Ex. 18 (February 2001 GPO Purchase Agreement between Organon and MHA).   The 2001 contract boasted a 12% ramp-up rebate for Remeron SolTab and market share rebates ranging from 5% to 12%.   *Id.*   Organon and GeriMed, a GPO to which Omnicare belonged, executed a similar contract in February 2001.   Ex. 19 (February 2001 GPO Purchase Agreement between Organon and GeriMed).

104.    MHA and Organon amended their February 2001 contract to remove Omnicare from the contract, paving the way for a direct contract between Organon and Omnicare.   On October 1, 2001, Organon and Omnicare executed a purchase agreement.  Ex. 20 (October 2001 Long Term Care Purchase Agreement between Organon and Omnicare).   This contract extended and increased Omnicare's ramp-up rebate to 14% until September 30, 2002, followed by a 4% to 16% market-share rebate, and provided a conversion rebate.  *Id.*   Although Omnicare did not grant Remeron SolTab "preferred" status or implement a therapeutic interchange, Omnicare did agree to place Remeron on "unrestricted access," defined in the 2001 contract as being available on Omnicare's formulary without any restrictions, such as prior authorization, NDC Locks, or the like, and as not being targeted for therapeutic interchanges to competitors' products.

105.    In February 2002, Organon signed another contract with Omnicare.   Ex. 21 (February 2002 Long Term Care Purchase Agreement between Organon and Omnicare).   This contract extended and increased Omnicare's ramp-up rebate to 14% until September 30, 2002, followed by a 4% to 16% market-share rebate.  *Id.*   Organon amended the contract in July 2002 to add a conversion rebate of up to 3% based on conversion of Remeron Tablet prescriptions to

Remeron SolTab.  Ex. 22 (July 2002 Amendment to February 2002 Long Term Care Purchase Agreement between Organon and Omnicare).  Organon's plan was successful; by mid-2002, Omnicare had the highest rate of conversion for any long-term care pharmacy provider.

106.     Through several contract amendments, Organon continued to offer the 14% ramp-up rebates, conversion rebates, therapeutic bonuses, and market-share rebates in various forms to Omnicare until December 31, 2005.  *See, e.g.*, Ex.  23 (October 2002 contract amendment extended ramp-up rebate until December 31, 2002); Ex. 24 (March 2003 contract amendment extending ramp-up rebate until December 31, 2003); Ex. 25 (April 2003 contract amendment adding 8% rebate on Remeron tablets); Ex. 26 (January 2004 contract amendment extending agreement until December 31, 2004 and basing rebates on Omnicare's "benchmark number"). Organon pricing data for Omnicare demonstrates that Omnicare received these rebates.  *See, e.g.*, Ex. 31 (First Quarter 2003 Data Showing Rebates to Omnicare from Organon for Remeron products); Ex. 32 (Second Quarter 2003 Data Showing Rebates to Omnicare from Organon for Remeron products); Ex. 33 (Third Quarter 2003 Data Showing Rebates to Omnicare from Organon for Remeron products); Ex. 34 (Fourth Quarter 2003 Data Showing Rebates to Omnicare from Organon for Remeron products).

107.     In addition to the significant market-share rebates and discounts and the conversion and therapeutic interchange rebates that Organon offered to Omnicare, Organon and Omnicare concocted various other schemes to funnel money to Omnicare for purchasing and recommending Remeron.  For example, the Omnicare strategy in the Business Plan included budgeting for "grants to fund studies," sponsorship of annual meetings, ReView Initiative, AccuMed software, and Omnicare Senior Care Outcome Initiatives.  Business Plan, Ex. 2, p. 9.

108.    Moreover, in November 2001, Relator Banigan became personally aware of Organon's offer to Omnicare of a substantial quantity of Remeron SolTab at nominal prices in an effort to dispose of short-dated product.   Organon specifically selected Omnicare because Omnicare had not yet converted to Remeron SolTab.   Organon achieved exactly what it wanted—Omnicare's conversion was kick-started.  Business Plan, Ex. 2, p. 8.

109.    Like PharMerica, Omnicare actively pursued Organon to participate in corporate partnership programs, which were mainly ways to funnel money to Omnicare in exchange for Remeron prescriptions.

### iii.    NeighborCare

110.    Like Omnicare, NeighborCare was a member of both GeriMed and MHA GPOs and was privy to the pricing provided by Organon on Remeron under those contracts in 1999.  In February 1999, Organon contracted with Managed Healthcare Associates ("MHA"), a GPO of which NeighborCare was a member.  Ex. 16.  Organon's February 17, 1999 contract with MHA pledged **ramp-up discounts of 14.8, followed by 8% to 15% discounts based on market tier in the post ramp-up period**.  *Id*.  Organon had a similar contract with GeriMed.  Ex. 17.

111.    Unlike Omnicare and PharMerica, NeighborCare decided to continue receiving its contract pricing through a GPO—Owen, later called Cardinal Health Provider Pharmacy Services.  Organon and Owen Healthcare, Inc. ("Owen") entered into an agreement on March 1, 2001 that employed the same basic terms as GeriMed's and MHA's, and included a **12% ramp-up discount through September 30, 2001, followed by 5% to 12% discounts based on market tier in the post ramp-up period, plus a 1.5% therapeutic interchange bonus and a conversion rebate of up to 3%**, all available only to long-term care members.  Ex.27 (March 2001 GPO Purchase Agreement between Organon and Owen).  These market-tier discounts were

derived at the individual long-term care pharmacy provider level and were not based on consolidated performance by all GPO members.  Remeron prices increased, but discount and rebate percentages remained the same in a June 2001 amendment.  Ex. 28 (June 2001 amendment to GPO Purchase Agreement between Organon and Owen).

112.    By 2002, NeighborCare was the only long-term care pharmacy provider member in the Owen GPO, as Omnicare had acquired American Pharmaceutical Services.  With a new agreement becoming effective on March 1, 2002, **the ramp-up discount increased to 14%, while the market tier rebates ranged from 4% to 16%**.  Ex. 29 (March 2002 GPO Purchase Agreement between Organon and Cardinal Health Provider Pharmacy Services).  A **9.5% rebate was offered only on Remeron Tablet until April 30, 2002**, but no conversion rebate was offered.  *Id*.  A June 2002 amendment to that agreement reflects that the parties had negotiated the **addition of a conversion rebate** to Exhibit B after Owen began shifting Remeron Tablet prescriptions to Remeron SolTab prescriptions.  Ex. 30 (June 2002 Amendment to March 2002 GPO Purchase Agreement between Organon and Cardinal Health Provider Pharmacy Services).  **Several amendments through 2003 extended the 14% ramp-up discount**, but reduced the market share tiers downward.

113.    Organon also offered other incentives to NeighborCare to entice it to convert Remeron Tablet prescriptions to Remeron SolTab and to implement a therapeutic interchange program that would grant Remeron "preferred" status.  For example, the Business Plan recommended budgeting for the following NeighborCare initiatives:  data purchasing, educational mailings, provision of educational and clinical services, personalized introduction for an in-service program on depression, $25,000 to sponsor annual meetings, conversion letters, conference calls, newsletters, and participation in advisory boards.  NeighborCare also solicited

45

kickbacks for conversion and therapeutic interchange in the guise of corporate partnership initiatives.

### iv. NCS Healthcare

114. Like NeighborCare, NCS Healthcare was a member of both GeriMed and MHA GPOs. NCS Healthcare benefited from the pricing provided by Organon on Remeron under those contracts in 1999. In February 1999, Organon contracted with Managed Healthcare Associates ("MHA"), a GPO, of which Omnicare was a member. Organon's February 17, 1999 contract with MHA pledged **ramp-up discounts of 14.8, followed by 8% to 15% discounts based on market tier in the post ramp-up period**. Ex. 16. Organon had a similar contract with GeriMed. Ex. 17.

115. NCS Healthcare refused to contract directly with Organon; instead it became a member of Committed Provider Services, a GPO. In January 2001, Organon contracted with Committed Provider Services, providing for a **12% ramp-up discount through September 30, 2001 and a 5% to 12% chargeback discount** after that based on market tier. Ex. 4. The contract also included a **1.5% therapeutic interchange bonus and a conversion rebate of up to 3%** for prescriptions converted from Remeron Tablet to Remeron SolTab available only to long-term care members of Committed Provider Services. *Id.* Organon terminated the contract on April 20, 2002. Upon information and belief, Organon continued to allow NCS Healthcare to access this contract pricing until Omnicare acquired NCS Healthcare in 2003.

116. Organon offered kickbacks to NCS Healthcare for conversion and implementing a therapeutic interchange program in which Remeron was given "preferred" status. For example, the strategy for NCS Healthcare in the Business Plan budgeted $7,000 for conversion letters. Business Plan, Ex. 2, p. 13. In addition, Maddox and McKenna set aside $10,000 to $20,000 to

support the annual meeting for NCS Healthcare.  Business Plan, Ex. 2, p. 13.  Other means of funneling money to NCS Healthcare included data purchasing agreements and money for creation of newsletters.

### v.    American Pharmaceutical Services ("APS")

117.    APS was one of the smaller of the large long-term care pharmacy providers.  In February 1999, Organon contracted with Managed Healthcare Associates ("MHA"), a GPO, of which APS was a member.  Organon's February 17, 1999 contract with MHA pledged **ramp-up discounts of 14.8, followed by 8% to 15% discounts based on market tier in the post ramp-up period**.  Ex. 16.  Organon had a similar contract with GeriMed.  Ex. 17.

118.    APS refused to contact directly with Organon and instead chose to receive its contract pricing through a GPO—Owen (later called Cardinal Health Provider Pharmacy Services).  Organon and Owen Healthcare, Inc. ("Owen") entered into an agreement on March 1, 2001 that employed the same basic terms as GeriMed's and MHA's, and included a **12% ramp-up discount through September 30, 2001, followed by 5% to 12% discounts based on market tier in the post ramp-up period, plus a 1.5% therapeutic interchange bonus and a conversion rebate of up to 3%**, all available only to long-term care members.  Ex. 27.

119.    These market-tier discounts were derived at the individual long-term care pharmacy provider level and were not based on consolidated performance by all GPO members.  WAC prices increased, but discount and rebate percentages remained the same in a June 2001 amendment.  Ex. 28.

120.    With a new agreement becoming effective on March 1, 2002, **the ramp-up discount increased to 14%, while the market tier rebates ranged from 4% to 16%**.  A **9.5% rebate was offered only on Remeron Tablet until April 30, 2002**, but no conversion rebate

was offered.  Ex. 29.  A June 2002 amendment to that agreement reflects that the parties had negotiated the **addition of a conversion rebate** to Exhibit B after Owen began shifting Remeron Tablet prescriptions to Remeron SolTab prescriptions.  Ex. 30.  APS received this pricing until it was acquired by Omnicare in 2002.

### vi.    Sunscript

121.    Sunscript was also another smaller chain of long-term pharmacies.  Like APS, Sunscript refused to contact directly with Organon and instead chose to receive its contract pricing through MHA.  Organon and MHA entered into an agreement on March 1, 2001 that included a **12% ramp-up discount through September 30, 2001, followed by 5% to 12% discounts based on market tier in the post ramp-up period, plus a 1.5% therapeutic interchange bonus and a conversion rebate of up to 3%**, all available only to long-term care members.  Ex. 27.

122.    In an effort to entice Sunscript to establish therapeutic interchange programs and to engage in conversion of Remeron Tablet prescriptions to Remeron SolTab, Organon offered kickbacks in various forms, including but not limited to data sharing agreements and annual meeting sponsorships, to Sunscript.  For example, the Business Plan proposed setting aside $15,000 per quarter for 2002 to purchase data from Sunscript and $15,000 to sponsor Sunscript's annual meeting.  Business Plan, Ex. 2, p. 14.  Organon's plan worked; Sunscript placed Remeron on its "preferred" product list.

### E.    Long-Term Care Pharmacy Providers Paid Bonuses to Pharmacy Managers Based on Medicaid Profit

123.    McKenna disclosed to Relator Banigan in a conversation that took place after November 25, 2003 that he had handled the PharMerica account.  During the Remeron Medicaid scheme, according to McKenna, compensation to PharMerica general managers and clinical

48

directors was based in part on Remeron profit.  Specifically, bonuses for both general managers and regional clinical directors were based upon weighted attainment of product initiatives.  There were 22 products that qualified for this bonus, each of which was weighted and rated according to priority.  Remeron Tablet had a priority rating of 7 out of 10, with 10 being the highest; Remeron SolTab had a rating of 9, which was based upon relative margin and opportunity to profit.  PharMerica's initiative for Remeron Tablet was to shift the business away from other non-priority anti-depressants.  When Remeron SolTab entered the market, discounts and rebates on Remeron Tablet were dropped to drive conversion to the new drug.  Once this occurred, PharMerica eliminated Remeron Tablet' relative rating altogether and replaced the product on its list of initiatives with Remeron SolTab, which took the third slot in priority.  Some of these discounts were passed onto the long-term care institutions, while a portion was retained by PharMerica and paid out as incentives to their site managers and clinical pharmacologists.

### X.   ORGANON DECREASED ITS OBLIGATIONS UNDER ITS REBATE AGREEMENTS WITH STATE MEDICAID PROGRAMS AND FAILED TO REPORT THE TRUE BEST PRICE

124.    Under 42 U.S.C. § 1396r-8, in order for a manufacturer of a drug to have its products compensated under Medicaid, the manufacturer must enter into a rebate agreement with the Secretary of Health and Human Services.  In Medicaid's multi-layered statutory system, even after Medicaid reimburses a pharmacy or provider for a prescription drug, it expects a quarterly accounting from the drug's manufacturer to ensure that it has received the "best price" for the drug industry-wide, and that the manufacturer pays a rebate for any shortfall.  Organon decreased its rebate obligations with respect to Remeron Tablet and Remeron SolTab in three ways: 1) including the deep discounts and rebates that it illegally offered its long-term care pharmacy provider customers in   its reported average manufacturer prices for Remeron Tablet and

Remeron SolTab; 2)  mischaracterizing transactions to avoid reporting its true best price for Remeron Tablet and Remeron SolTab; and 3) failing to maintain adequate procedures and control of its membership list of 340B covered entities to whom Organon must offer 340B pricing on all its drugs, including Remeron and Remeron SolTab.

### A.  Meaning of "Average Manufacturer Price" and "Best Price"

125.    Organon entered into a rebate agreement with Medicaid, under which Organon had to comply with the rebate requirements set forth in 42 U.S.C. § 1396r-8, including reporting its "average manufacturer price" ("AMP") and "best price" for each of its drugs to Centers for Medicare and Medicaid Services ("CMS") each quarter.  AMP and best price are used to calculate the quarterly rebate payment that each participating manufacturer must make to state Medicaid pharmacy programs.  The AMP is defined as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts."  42 U.S.C. § 1396r-8(k)(1).  Discounts and rebates provided to long-term care pharmacy providers were a customary deduction from AMP during the relevant time period.

126.    The Medicaid statute defines "best price" as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity or governmental entity."  42 U.S.C. § 1396r-8(c)(1)(C).  The section also provides that "best price" includes "cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates."

127.    Best price does not include "prices that are merely nominal in amount" unless those nominal priced sales are contingent upon any purchase requirement.  42 U.S.C. § 1396r-8(c)(1)(C)(ii).

128.    In addition, prices offered to 340B covered entities are not included in the best price calculation.  42 U.S.C. § 139r-8(c)(1)(C)(i).  To assure that prices offered to 340B covered entities are not included in the rebate calculation, the Office of Pharmacy Affairs ("OPA") for Department of Health and Human Services maintains a "Medicaid Exclusion" file, which lists the current eligible 340B entities that have reported their intent to fill Medicaid prescriptions with 340B-purchased drugs.  The "Medicaid Exclusion" file allows state Medicaid agencies to determine which 340B entities' claims must be excluded for rebate requests from a drug manufacturer.  Drug manufacturers also maintain 340B membership lists that track entities eligible to receive 340B pricing; these lists are generally updated on a quarterly basis.

**B.      Organon Decreased its Obligations under its Rebate Agreements with State Medicaid Programs**

129.    Organon's scheme to have its sales representatives fraudulently market the "Opportunity to Profit" from Remeron and Remeron SolTab ultimately impacted Organon's reported quarterly AMP calculations.  Under Organon's rebate agreement with Medicaid, Organon was required to calculate its AMP by averaging its actual prices for Remeron Tablet and Remeron SolTab.  In reviewing documents as part of his normal course of employment, Relator Banigan discovered that Organon made sure to deduct the deep discounts and rebates that it illegally offered to long-term care pharmacy providers on these drugs in making its AMP calculations.  Doing so produced a lower AMP than if the discounts and rebates had not been considered.  Under the formula used to calculate a pharmaceutical manufacturer's rebate liability, a reduced AMP results in a lower rebate amount due Medicaid.   Organon therefore decreased its liability under its rebate agreement with Medicaid by including illegally-discounted long-term care discounts and rebates into its calculation of AMP.

130.    In addition, Organon concealed its true "best price" from the Government.   In order to enable Organon to circumvent setting a best price, Organon offered kickbacks in various forms to long-term care pharmacy providers, such as Omnicare, PharMerica, NeighborCare, NCS Healthcare, APS, and Sunscript.   These kickbacks included, but were not limited to, data sharing agreements for the purchase of LTCPP prescribing data, research grants, educational grants, access fees, sponsorship of long-term care pharmacy providers' annual meetings, advisory panels, and other forms of remuneration.   By failing to disclose to Medicaid the payments it provided to long-term pharmacy providers, Organon misrepresented its true "best price" to Medicaid, thereby lowering its rebate liability to Medicaid.

### C.    Organon Avoided Reporting the True Best Price By Mischaracterizing Transactions as Nominal or Entering Into Improper Discount Arrangements

131.    Organon avoided reporting its true best price for Remeron Tablet and Remeron SolTab by mischaracterizing transactions as nominal or through entering into improper discount arrangements.

132.    For example, in at least two instances, one involving Omnicare and one involving PharMerica, Organon avoided disclosing the true best price by coupling the sale of nominally-priced Remeron SolTab that was about to expire with the requirement to purchase a similar quantity of Remeron SolTab at normal commercial prices.   In November 2001, Relator Banigan became personally aware of Organon's offer to Omnicare of a substantial quantity of Remeron SolTab at nominal prices in an effort to dispose of short-dated product (i.e., product that would expire quickly).   Organon selected Omnicare because Omnicare had not yet converted to Remeron SolTab.   Both parties verbally understood that this offer was contingent upon Omnicare's later purchase of a similar quantity of Remeron SolTab at contracted discounts of 17%.   Organon willfully violated best price requirements by disclosing the transactions

52

independent of one another despite that fact that the nominal price offer was contingent upon a commercial sale.  Had the two transactions been considered together, the best price calculation for the fourth quarter of 2001 would have dramatically dropped by an estimated 40%.

133.    In reviewing documents as part of his normal course of employment, Relator Banigan discovered that Organon made a similar deal with PharMerica in the third quarter of 2001.  Organon offered PharMerica a large amount of Remeron SolTab at a nominal price in order to dispose of Remeron SolTab that would expire quickly.  This sale was conditional; PharMerica had to purchase a similar quantity of the drug at commercial prices.  Organon structured the sale in a manner intended to defraud the government.  In order to avoid disclosing the transaction, Organon sold the product to PharMerica through a wholesaler rather than by a direct sale to PharMerica.  The result, however, is the same:  Organon failed to report the true best price by disclosing the transactions independent of one another even though best price requirements required Organon to report them together.

134.    Shortly after the PharMerica transaction occurred, Banigan requested a meeting with Organon's president, Michael Novinski, to discuss his concerns about the transaction. Novinski acknowledged that he was aware of the PharMerica transaction and that he was "happy" about it.   When Banigan expressed his concerns about the implications of the transaction on best price calculations, Novinski asked how much it would cost to fix the problem and the chances of getting caught.  Banigan explained that the problem would probably cost around $1 or $2 million to correct and that the chances of getting caught were low.  Novinski responded that Banigan should leave the issue alone.  Worried that he would be terminated, Banigan did not pursue the issue further.

135.    Organon also lowered its rebate liability by participating in an improper discount arrangement with Kaiser Permanente ("Kaiser").  In 1997, Organon entered into a fixed-price contract with Kaiser to provide several of its products, including Remeron, at discounted prices. On June 20, 1999, Organon and Kaiser amended the contract to extend the discounts for another three years.  On February 28, 2001, Organon raised the price of Remeron.  Realizing that Kaiser's discounted Remeron price would result in a new best price, Organon approached Kaiser to resolve the issue.  The contract, however, failed to provide for cancellation or price adjustments should the product prices increase.  Kaiser told Organon that it could either buy itself out of the contract or provide the same discounts to which Kaiser was entitled on Remeron under contract on another drug product that was not setting a best price.  Organon agreed to discount Zemuron, a muscle stimulant with little or no Medicaid sales used mainly in hospitals, in exchange for increasing the price of Remeron.  In order to conceal the best price violation, Organon backdated the amendment to the Kaiser contract to make the prices effective as of April 1, 2001 and backed out any transactions for Remeron that had occurred since April 2001 in its chargeback system.  Pursuant to this understanding, Organon and Kaiser continued to amend the original fixed-price contract as the price of Remeron increased until at least 2004.  This new arrangement allowed Organon to hide the discounts and avoid reporting its true best price on Remeron, thereby reducing its rebate liability to state Medicaid programs.

136.    In addition, Organon's failure to report the true best price caused other federal purchasers, such as entities qualifying for 340B pricing, the Department of Defense, the Veterans' Administration, the Bureau of Prisons, and the Bureau of Indian Affairs, to pay higher prices for Remeron Tablet and Remeron SolTab, because the federal government uses best price reporting to set prices for 340B entities and the Federal Supply schedule.

**D.    Organon Sold Remeron at 340B Pricing to Ineligible Entities, Causing Its Best Price Reporting to Be Inaccurate for Some Quarters**

137.    Organon fraudulently violated its Medicaid rebate agreement in a further respect, by failing to maintain adequate procedures and control of its membership list of 340B covered entities to which Organon must offer 340B pricing on all its drugs, including Remeron and Remeron SolTab.  340B sales transactions are exempt from best price determination, to the extent that these government prices are only extended to 340B eligible entities.  Organon was advised of these issues but elected not to resolve the matter.  Organon understood that not including such transactions in its reported "best price" calculation would grossly lower their Medicaid rebate liability.

138.    In addition, Organon intentionally or recklessly failed to maintain its membership list of 340B covered entities.  Organon was permitted under the Public Health Service Act of 1992 to sell its drugs to 340B covered entities under special government pricing.  See 42 U.S.C. § 256b.  Organon's failure to maintain its membership list of 340B-covered entities caused Organon to sell its drugs, including Remeron Tablet and Remeron SolTab, at the special 340B pricing to customers who were not qualified to receive this pricing.  While transactions involving the sale of Remeron and Remeron SolTab at 340B pricing to eligible 340B entities are exempt from best price calculations, sales to entities that are or have become ineligible are not.  If transactions involving the sale of Remeron Tablet and Remeron SolTab at the special government pricing provided to ineligible entities had been included in Organon's best price calculation, a new best price would have been set for at least some of the previously reported calendar quarters.

139.    Banigan learned of this issue in 1999 or 2000 during a routine check of the government pricing systems to validate government pricing calculations.  As part of the check,

Banigan randomly audited a sampling of the master customer list to determine whether customers were listed under the correct class of trade, e.g. "entity eligible to receive government pricing."  Banigan analyzed a few of the customers listed as entities that received government pricing and determined that these customers were ineligible under Section 340B to receive this pricing.

140.    Realizing that Organon was not maintaining its membership list of 340B covered entities and concerned about Organon's exposure due to this failure, Banigan spoke with Sean Gallagher, the Associate Director of Contracting Department for Organon, as the Contracting Department was responsible for maintaining the membership list.  Gallagher explained to Banigan that Organon did not routinely check the list published by OPA to determine an entity's eligibility to receive government pricing under Section 340B.  Instead, Organon would sometimes place an entity on the membership list, if that entity identified itself as being an eligible 340B entity.  Gallagher reluctantly agreed to have his staff perform a review of the 340B membership list and correct the problem.  Organon, however, did not attempt to recover the commercial price from the ineligible entities, nor did it restate its best price to the government under its Medicaid rebate agreement.

141.    Despite assurances that the problem had been corrected, Banigan encountered the same issue again when, every year or so, he performed routine checks of the government pricing system to validate government pricing calculations.  Each time Banigan would report the problem to the Contracting Department and to senior management, the Contracting Department would assure Banigan that the problem had been resolved.  Banigan did not see any changes in the maintenance procedures of the 340B covered entity membership list, until 2005, when the management of the Contracting Department changed.  At that time, a written policy or work

instruction was established, requiring that Organon personnel verify a customer's 340B eligibility through the OPA website before placing that entity on the Organon 340B covered entity membership list.  Once an entity's 340B eligibility was verified, it was listed as a member able to receive a 340B contract price; the continuing eligibility of that entity was never re-validated.  Thus, following implementation of procedures in 2005, Organon still would have sold products at 340B pricing to ineligible entities, causing false best prices to be set in certain quarters.

142.    Banigan discussed Organon's failure to maintain its 340B covered entity membership list and the effect on best price reporting several times with Organon's senior management.  When Banigan suggested that Organon restate its best price and rebate liability under its Medicaid agreement, senior management told him that Organon would not go back, but would correct the problem going forward.  In fact, senior management would not authorize resources to audit the government pricing system to correct problems with the system, including the problems with Organon's membership list of 340B covered entities.

143.    As a result of Organon's failure to maintain its membership list of 340B covered entities, Organon sold Remeron Tablet and Remeron SolTab at 340B pricing to entities ineligible to receive this special pricing.  Any transactions with these ineligible entities would have been considered commercial transactions and therefore should have been included when calculating best price.  Yet Organon failed to report transactions involving these ineligible entities and excluded them from the best price reporting, claiming that these transactions involved 340B eligible entities. Furthermore, Organon made no attempt to extract from these ineligible entities the unintended discount.   Instead, Organon would remove the ineligible entity from the membership list and simply move forward as if nothing ever happened.

144.     It is estimated that twenty percent of the quarterly best price filings for Organon's drugs, including Remeron and Remeron SolTab, were rendered false due to the inclusion of ineligible entities in the 340B covered entities membership list.  As a result, Organon's liability under its Medicaid rebate agreement was thus reduced in some quarters from 1999 to 2006, resulting in significant damages.  In addition, Organon's failure to report a true best price in some quarters from 1999 to 2006 caused other federal purchasers, such as 340B entities, the Department of Defense, the Veterans' Administration, the Bureau of Prisons, and the Bureau of Indian Affairs, to pay higher prices for Remeron Tablet and Remeron SolTab, because the federal government uses best price reporting to set prices for 340B entities and the Federal Supply schedule.

## XI.   ORGANON'S OFF-LABEL MARKETING OF REMERON

### A.     Statutory and Regulatory Background

#### i.     The FDA's Role in the Regulation of Prescription Drugs

##### a.     FDA Approval of Prescription Drugs

145.     The FDA regulates human use of pharmaceutical drugs such as Remeron and Remeron SolTab.  Companies seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug and Cosmetic Act ("FDCA").  21 U.S.C. § 301, *et seq*.  Notably, the FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective.  21 U.S.C. § 355(a) and (b).

146.     In order for a company to gain approval of a drug by the FDA, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355.  The company is required to include in its NDA all intended uses proposed for a new drug's

labeling and to prove that the new drug is safe and effective for those uses.  21 U.S.C. § 355(b).

To prove that the drug is safe and effective, the company must provide the FDA with data from

scientifically sound clinical trials.  The FDA will refuse approval of a new drug unless, on the

basis of all information reviewed, it is demonstrated that a drug can safely accomplish its

purported effect under the conditions proposed, and that the method of manufacture and

distribution will properly preserve the drug for this purpose.  21 U.S.C. § 355(d).

b.      **FDA Regulation of Manufacturers' Marketing of Prescription Drugs**

147.    When the FDA reviews an NDA and approves a drug for interstate distribution,

that approval is only effective for the intended uses that were proposed in the NDA and

described on the drug's approved label.  Any use for a drug that was not proposed in the NDA

and approved for the label by the FDA is referred to as "unapproved" or "off-label."   65

Fed.Reg. 14286, 14286 (Mar. 16, 2000).  Although physicians traditionally may prescribe a drug

for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical

companies are strictly prohibited from marketing a drug for an off-label use.

148.    When a company markets a drug off-label, the drug becomes a new drug for that

purpose and is considered "misbranded" in violation of 21 U.S.C. § 331; 21 U.S.C. § 352(f); 21

C.F.R. § 310.3 (h)(4) and (5); 65 Fed.Reg. 14286, 14286 (Mar. 16, 2000) ("an approved new

drug that is marketed for a 'new use' is also 'misbranded' under the FDCA, because the labeling

of such a drug would not include 'adequate directions for use'").  Section 352 of title 21 of the

United States Code lists situations in which a drug is illegally misbranded, including but not

limited to situations where: (1) the drug's labeling is "false or misleading in any particular;" (2)

the drug's labeling does not bear adequate direction for use; or (3) the drug's labeling does not

bear "adequate warnings against use in those pathological conditions or by children where its use