UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12153-RWZ

UNITED STATES OF AMERICA *ex rel.*
JAMES BANIGNAN AND RICHARD TEMPLIN, *et al.*

v.

ORGANON USA INC., *et al.*

MEMORANDUM OF DECISION

April 9, 2012

ZOBEL, D.J.

Relators, James Banigan and Richard Templin, bring this qui tam action on behalf of the United States of America, twenty-seven states,[1] the District of Columbia, and the City of Chicago under the False Claims Act, 31 U.S.C. §§ 3729-33, against defendants Akzo Nobel N.V. ("Akzo Nobel"), Organon Biosciences N.V., Organon USA, Inc., Organon Pharmaceuticals USA, Inc., Organon International, Inc. (collectively "Organon" or "Organon defendants"),[2] Schering-Plough, Merck & Co., Inc., Omnicare, Inc., and PharMerica, Inc. Relators claim that from 1999-2006, Organon, a pharmaceutical company, engaged in a scheme to offer unlawful remuneration to long-term care pharmacies – Omnicare and PharMerica, among others – in exchange for the

---

[1] California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin.

[2] I do not use the term "Organon" to include defendant Akzo Nobel.

pharmacies prescribing its antidepressants, Remeron Tablet and Remeron SolTab (collectively "Remeron"), to patients. This scheme allegedly resulted in the pharmacies filing hundreds of millions of dollars in fraudulent claims for Medicaid prescription drug reimbursements.

Akzo Nobel moves to dismiss all claims against it for lack of personal jurisdiction and improper service of process under Fed. R. Civ. P. 12(b)(2) and 12(b)(5), respectively. (Docket # 116.) It also moves to dismiss under Fed. R. Civ. P. 12(b)(6), 9(b), and 12(b)(1) (Docket # 126), joining the other defendants who likewise move on these grounds (Docket ## 123, 125, 128). Per the court's order of March 30, 2012 (Docket # 167), and for the reasons explained below, Akzo Nobel's motion to dismiss for lack of personal jurisdiction is allowed. The remaining defendants' motions to dismiss will be addressed in a subsequent order.

## I. Background

### A. Akzo Nobel

According to the Relators' Third Amended Complaint (Docket # 105), Akzo Nobel is a Netherlands corporation "specializing in chemical coatings." It engages in activities including "developing, marketing, and selling pharmaceutical products throughout the U.S. " through its "corporate center, business units, subsidiaries, officers, directors, employees, and agents." It has business units in Pharmaceutical, Coatings, and Chemicals, which include companies operating in the U.S. Its corporate center coordinates tasks in areas like "finance, human resources, technology, legal matters, and intellectual property," and its employees "often rotated to and held

positions at Organon USA, Inc."

Organon USA, Organon Pharmaceuticals USA, Organon International, and Organon Biosciences N.V. were, at all relevant times, wholly-owned subsidiaries and pharmaceutical business units of Akzo Nobel. Organon USA is a New Jersey pharmaceutical company that manufactures and sells Remeron. Akzo Nobel sold Organon to Schering-Plough in November 2007. Merck & Co. and Schering-Plough merged in November 2009, with Merck continuing as the surviving public corporation.

Relators allege that Organon USA, Organon International, and Organon Pharmaceuticals USA were "mere instrumentalities and/or agents" of Akzo Nobel. They claim that Akzo Nobel exerted control over Organon by approving pharmaceutical budgets and marketing plans; "frequently interact[ing] and correspond[ing] with Organon Pharmaceuticals' executives"; controlling the salaries of Organon employees, for example by requiring Organon USA's senior management to obtain approval for any raises given to employees that exceeded ten percent; and paying the salaries of Organon USA's in-house legal counsel. They also note that Organon's CEO sat on Akzo Nobel's board and reported directly to its CEO, and that Akzo Nobel's board member responsible for the Pharma unit required Organon Pharmaceuticals USA to send him regular reports on market trends and sales, including reports on Remeron.

In their opposition to Akzo Nobel's motion to dismiss (Docket # 165 and exhibits), Relators proffer several additional jurisdictional facts: (1) In October 2001, Akzo Nobel's Chief Financial Officer spoke to American investors in New York and described the Pharma Group, which included Organon, as the "driver of Akzo Nobel's

3

financial performance." The company issued a contemporaneous press release that was distributed to American media and which noted that the U.S. accounted for a large portion of the Pharma Group's sales. (2) As of the time this action arose, until 2007, the company was listed on the NASDAQ stock exchange. (3) Akzo Nobel owns over 800 U.S. patents, including the patent for Remeron Tablet and Remeron SolTab, and has brought two patent infringement suits in U.S. courts. (4) It also held a U.S.-registered trademark that appears on Organon's correspondence with the U.S. Food and Drug Administration ("FDA") and Organon documents attached to the complaint, including rebate checks that Organon sent to Omnicare.[3]

For its part, Akzo Nobel proffers two declarations from its Corporate Secretary, Jacqueline Muller. See Docket # 117 Ex. 1 (Muller Decl.); Docket # 139 Ex. 1 (Muller Supp. Decl.). Among other things, Muller states that Akzo Nobel is not licensed or registered to do business anywhere in the U.S.; has no plants, offices, property, bank accounts, telephone numbers or listings, post office boxes, or employees in the U.S.; and has never manufactured, marketed, advertised, distributed, labeled or otherwise sold pharmaceutical products – including Remeron – in the U.S. Muller Decl. ¶¶ 2-3. She avers that Organon Biosciences N.V., Organon USA, Organon Pharmaceuticals USA, and Organon International were separately incorporated subsidiaries of Akzo Nobel, id. at ¶ 4, and that these subsidiaries were "at all times responsible for the development, manufacturing, marketing and sales of Remeron." Muller Supp. Decl. ¶

---

[3] Each document Relators offer bearing the Akzo Nobel mark or logo also contains the Organon logo or is otherwise identified as originating from Organon. Docket # 1 Exs. 12, 15, 31-34, 37, 63, 95; Docket # 165 Ex. K.

4

7. She further states that between 1999-2006, Akzo Nobel did not have any employees, facilities, or offices in the U.S., but that it did own separately incorporated subsidiaries in the U.S., many of which had "Akzo Nobel" as part of their corporate name (e.g., Akzo Nobel, Inc., Akzo Nobel Chemicals, Inc., Akzo Nobel Surface Chemistry LLC). Id. ¶ 2, 4-6.

Since it sold Organon to Schering-Plough in 2007, Akzo Nobel was divested of all interests in Organon. All of its employees "with knowledge of the facts and documents relevant to this litigation were transferred to Schering-Plough." Muller Decl. ¶ 5. Relators have not controverted any of Muller's aforementioned statements.[4]

### B. Relators' Claims

The Third Amended Complaint contains five counts under the federal False Claims Act.[5] Relators allege that Organon offered long-term care pharmacies unlawful kickbacks, often disguised as market-share discounts and rebates, and other remuneration to entice the pharmacies to convert as many of their long-term care patients as possible from other competitor antidepressants to Remeron. They describe

---

[4] Although Relators claim that Akzo Nobel has (or had at the relevant time) research facilities and offices in the U.S., their proffered supporting documents show that these facilities and offices were, in fact, owned and operated by subsidiaries of Akzo Nobel. Docket # 165 Ex. D-I; Muller Supp. Decl. ¶¶ 3-6.
    Relators also make much of the fact that Akzo Nobel's U.S.-registered trademark appeared on Organon's correspondence with the FDA discussing Remeron, and that one letter references Remeron production records written "in Dutch." Docket # 165 Ex. K. They cite this fact in an effort to negate Akzo Nobel's – a Dutch company – claim that it has never manufactured or distributed Remeron. But the fact is easily explained by Muller's uncontroverted statement that Organon Biosciences N.V. – one of the companies responsible for manufacturing, marketing, and selling Remeron – owned, leased, or operated facilities in the Netherlands. Muller Supp. Decl. ¶¶ 7-8.

[5] Counts VI-XXXIV allege violations of state false claims statutes, and Count XXXV seeks common fund relief. None of these counts is relevant to the court's disposition of the instant motion.

this process of conversion as "therapeutic interchange." They also allege that Organon promoted off-label uses for Remeron Tablet and Remeron SolTab in order to maximize the success of the therapeutic interchange program. Relators claim that the pharmacies submitted claims for reimbursement to state Medicaid programs for Remeron prescriptions that were tainted by these alleged kickbacks and off-label promotion, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

They further allege that Organon reduced its rebate liability to state Medicaid programs by: (1) concealing its true "best price" for Remeron Tablet and Remeron SolTab; (2) lowering its average manufacturer price ("AMP") for Remeron by including in its AMP calculation the discounts and rebates it gave to long-term care pharmacies; (3) avoiding disclosure of the true "best price" for Remeron by mischaracterizing transactions as nominal or entering into discount arrangements; and (4) selling Remeron at a discounted price to entities not qualified to receive the discounts.[6] Finally, they allege that, through these actions, Organon, Omnicare, and PharMerica conspired to defraud the U.S. by getting false or fraudulent claims allowed or paid, and that Organon and Schering-Plough retaliated against them in response to their investigation and initiation of their claims.

## II. Analysis

On a motion to dismiss for lack of personal jurisdiction where no evidentiary

---

[6] 42 U.S.C. § 256b establishes "covered entities" which are entitled to received statutorily defined discounts on outpatient drugs. Pharmaceutical manufacturers are required to participate in this so-called "340B program" as a condition of having drug charges reimbursed by Medicaid. County of Santa Clara v. Astra USA, Inc., No. C 05-03740, 2006 U.S. Dist. LEXIS 57176 (N.D. Cal. July 28, 2006).

hearing has been held, it is a plaintiff's burden to make a prima facie showing that the court has personal jurisdiction over a defendant. United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 44 (1st Cir. 1993) [hereinafter, "Pleasant Street II"]. To do so, plaintiff must "go beyond the pleadings and make affirmative proof." United States v. Swiss Am. Bank, 274 F.3d 610, 619 (1st Cir. 2001) (quoting Pleasant Street II, 987 F.2d at 44). The court will accept as true "properly supported proffers of evidence by a plaintiff," id., and will also consider uncontradicted facts offered by the defendant. Mass. Sch. of Law at Andover, Inc. v. Amer. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998). The court is not required to "credit conclusory allegations or draw farfetched inferences." Id.

For a court to exercise personal jurisdiction over a defendant, service of process must be grounded in a federal statute or rule and the exercise of jurisdiction must comport with due process. United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085-86 (1st Cir. 1992) [hereinafter "Pleasant Street I"]; Swiss Am. Bank, 274 F.3d at 618. Service is authorized here because the False Claims Act provides for worldwide service of process. 31 U.S.C. § 3732(a).

To comport with due process, a defendant must have sufficient "minimum contacts" with the forum. Pleasant Street I, 960 F.2d at 1088. In a federal question case, like this, where the due process clause of the Fifth Amendment dictates the constitutional limits of the court's personal jurisdiction, "a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." Swiss Am Bank, 274 F.3d at 618.

7

Personal jurisdiction over a defendant may be either "specific" or "general." Id. "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." Id. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum . . . ." Id. Even in the absence of general or specific jurisdiction, a court may still assert personal jurisdiction over a parent company if the plaintiff can establish that it would be appropriate to pierce the corporate veil. Pleasant Street I, 960 F.2d at 1093.

Relators argue that they have met the tests for both specific and general jurisdiction over Akzo Nobel. In the alternative, they contend that corporate veil-piercing is appropriate. They request limited jurisdictional discovery in the event the court finds that it lacks personal jurisdiction over Akzo Nobel.

**A. Specific Jurisdiction**

Three criteria must be satisfied for the court to assert specific jurisdiction over a defendant: (1) the plaintiff's claim must "directly relate[ ] to or arise[ ] out of the defendant's contacts with the forum;" (2) the defendant's contacts must constitute "purposeful availment of the benefits and protections afforded by the forum's laws;" and (3) the exercise of jurisdiction must be reasonable in light of "a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction" (i.e. the

gestalt factors).[7] Swiss Am. Bank, 274 F.3d at 620-21 (quotations omitted).

The relatedness requirement focuses on the "nexus between defendant's contacts and the plaintiff's cause of action." Id. (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994)). The First Circuit has explained that

> the relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection. . . . This court steadfastly rejects the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect. Instead, the defendant's in-state conduct must form an important or at least material, element of proof in the plaintiff's case. A broad "but-for" argument is generally insufficient. Because "but for" events can be very remote, . . . due process demands something like a "proximate cause" nexus.

Negron-Torres v. Verizon Comm'ns, Inc., 478 F.3d 19, 25 (1st Cir. 2007) (quotations, alterations, and citations omitted).

None of the contacts that Relators muster to satisfy the relatedness requirement do so. Akzo Nobel's approval of Organon's pharmaceutical budgets and marketing plans, and its alleged requirement that Organon send it regular updates of pharmaceutical market trends and sales, relate to the relationship between Akzo Nobel and Organon and do not establish contacts between Akzo Nobel and the U.S. See Swiss Am Bank, 274 F.3d at 621 (defendant's business relationship and/or contract with U.S. resident (who was predecessor-in-interest to U.S.) was "not itself a contact with the U.S. as a forum") (citing Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995)

---

[7] The gestalt factors include: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." Pleasant Street II, 987 F.2d at 46 (quotation marks and citations omitted).

9

(emphasis in original); Sawtelle, 70 F.3d at 1389 (to meet relatedness requirement, cause of action must arise out of "specific contacts between the defendant and the forum" and not out of general relationship between parties). Furthermore, Akzo Nobel's approval of Organon's business plans does not establish that it was involved in creating the plans or implementing them, much less that it caused the specific harm alleged here. Cf. Alvarado-Morales v. Digital Equip. Co., 843 F.2d 613, 617 (1st Cir. 1988) (defendants' approval of subsidiary's "resignation plan" at issue was insufficient to show the "requisite specific involvement in creating and implementing it" to satisfy Puerto Rican long-arm statute's requirement that defendant consummated some act or transaction in Puerto Rico); In re Lupron Mktg. and Sales Practices Litig., 245 F.Supp.2d 280, 292-93 (D. Mass. 2003) (parent's authority to approve subsidiary's marketing strategies did not establish requisite degree of control over subsidiary to subject it to personal jurisdiction under corporate alter ego or agency theory) (citing cases). The use of Akzo Nobel's trademark or logo by its subsidiaries on their documents is likewise insufficient to demonstrate that it caused those documents to be made or otherwise controlled their content.

Relators contend that Akzo Nobel brought two patent infringement suits "as part of a larger plan" to prevent Remeron Tablet's patent expiration from affecting Remeron's sales by converting long-term care patients' prescriptions from Remeron Tablet to the patent-protected Remeron SolTab. See also Docket # 1 ¶¶ 4, 55-56. The complaint simply alleges no facts to suggest that Akzo Nobel's patent infringement suits were part of any such "plan" let alone the conversion scheme Relators describe. Akzo

Nobel's enforcement of its patent rights has no bearing on whether a long-term care pharmacy would convert a patient's prescription from Remeron Tablet to Remeron SolTab.

Relators offer no contacts to establish the requisite nexus between Akzo Nobel and their causes of action. The court thus lacks specific jurisdiction over Akzo Nobel.

### B. General Jurisdiction

A court exercising general jurisdiction over a defendant must ensure that two criteria are met: (1) "there must be continuous and systematic general business contacts between the foreign defendant and the forum"; (2) "the plaintiff must show that the exercise of jurisdiction would be reasonable." Swiss Am. Bank, 274 F.3d at 619 (quotations and citations omitted). "[T]he standard for evaluating whether these contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific jurisdiction questions." Id. (quoting Noonan v. Winston Co., 135 F.3d 85, 93 (1st Cir. 1998)). "In addition, courts must exercise even greater care before exercising personal jurisdiction over foreign nationals." Noonan, 135 F.3d at 93 (citing Asahi Metal Indust. Co., Ltd. v. Sup. Ct. of Cal., Solano Cnty., 480 U.S. 102, 115 (1987)).

The "quality and quantity of contacts between the potential defendant and the forum" are central to the court's general jurisdiction inquiry. Id. (quoting Philips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)). The inquiry itself is "highly idiosyncratic" and "fact-specific," but "it may be guided by the types of contacts deemed sufficiently continuous and systematic in other cases." Cossaboon v.

Maine Medical Center, 600 F.3d 25, 33 (1st Cir. 2010) (quoting Noonan, 135 F.3d at 93).

Relators argue that the court may exercise general jurisdiction because the U.S. "constituted a large portion" of Akzo Nobel's pharmaceutical business; the company was listed on the NASDAQ stock exchange; it owns U.S. patents and has filed two patent infringement suits in U.S. courts; and it holds a U.S. registered trademark that was used by its subsidiaries on correspondence with the FDA.

None of these contacts alone is sufficiently "continuous and systematic" to justify the exercise of general jurisdiction over Akzo Nobel. That its Pharma Group subsidiaries (including Organon) did a brisk business in the U.S. does not establish any contacts with the U.S. by Akzo Nobel itself. See Escude Cruz v. Ortho Pharma. Corp., 619 F.2d 902, 905 (1st Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary.") (citing Canon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333 (1925)). "There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." Id.

Filing two lawsuits in the U.S. is not "continuous and systematic" activity. See e.g., Merlino v. Harrah's Entm't, Inc., No. 05 CV 6660, 2006 WL 401847, at *3 (E.D. Pa. Feb. 17, 2006) ("filing even nineteen lawsuits, without more, cannot constitute continuous and systematic activity so as to establish general jurisdiction"); In re Genetically Modified Rice Litigation, 576 F.Supp.2d 1063, 1070 (E.D. Mo. 2008)

(contract with forum-based corporation and filing of two lawsuits in the forum were not "systematic"). Neither is holding U.S. patents or listing on the U.S. stock exchange. See e.g., In re Chocolate Confectionary Antitrust Litigation, 602 F.Supp.2d 538, 566-67 (M.D. Pa. 2009) (following contacts – alone and in the aggregate – were insufficient for general jurisdiction: issuance of investment devices that allowed investors to trade foreign defendant's shares on U.S. exchanges; ownership of U.S. patents; maintenance of global website; participation in U.S. merger transactions; submission to jurisdiction of U.S. courts; control over U.S. subsidiaries, and execution of licensing agreement).

Relators cite no relevant authority to support their claim that owning a trademark or logo is a "continuous and systematic contact" for general jurisdiction purposes.[8] To find otherwise on these facts would be to subject a parent company to potential liability whenever one of its subsidiaries uses the parent's mark or logo. Cf. NBA Properties, Inc. v. Gold, 895 F.2d 30, 33 (1st Cir. 1990) (franchisors permitting franchisees to use their company name in connection with stores that sold unauthorized NBA merchandise did not violate court decree prohibiting franchisors from "enabling" the forbidden conduct; such a holding would "impose[ ] strict liability upon the [f]ranchisors for the acts of their franchisees").

Finally, the aforementioned contacts in the aggregate are less compelling than

---

[8] The cases on which they rely, Clune v. Alimak AB, 233 F.3d 538, 540, 543-44 (8th Cir. 2000) and Vandelune v. 4B Elevator Components Unlimited, 148 F.3d 943, 948 (8th Cir. 1998), are distinguishable. Both were product liability cases where the court found that exercise of jurisdiction over the defendant was proper because, among other things, a foreign defendant had put its logo on the offending product and deliberately set up a distribution system that made such product available for purchase in the forum state. Moreover, these contacts were only used to establish the "purposeful availment" prong of the constitutional due process analysis, not to establish the continuous and systematic contacts required for the court to assert general jurisdiction.

contacts found to be insufficient for general jurisdiction in other cases.  See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984) (no "continuous and systematic business contacts" where defendant sent its CEO to forum to negotiate a contract; accepted into its bank accounts checks drawn on a forum-based bank; spent "substantial sums" to purchase helicopters, equipment, and training services from a forum-based company; and sent its employees to the forum for training); Cossaboon, 600 F.3d at 39 (defendant hospital advertised to forum residents, operated a website accessible in forum, registered to do business in forum and employed one person to work there, participated in a system that facilitated patient transfers, entered into an agreement with a forum-based medical school, and treated a substantial number of forum residents at its facility); Swiss Am. Bank, 274 F.3d at 619-20 (defendant bank placed twelve advertisements in an American magazine over two years; subscribed to an American credit card; entered into a licensing agreement with American credit card company; contracted with American company for the provision of ATM support services; was an appellant in Florida lawsuit; entered into a joint venture with an Ohio bank; loaned $350,000 to a Colorado company; had banking relationships and accounts with four New York banks and a business relationship with a Massachusetts resident);  Noonan, 135 F.3d at 93 (defendant sent its employee to the forum to photograph the plaintiff; regularly solicited business – via phone and by visiting the forum – from a forum-based company; and received approximately $585,000 worth of orders from that same company); Donatelli v. Nat'l Hockey League, 708 F.Supp. 31, 35 (D.R.I. 1989) (reciting facts), reversed 893 F.2d 459 (1st Cir. 1990)

(for ten years defendant had provided league officials at exhibition hockey games, conducted scouting activity, provided television broadcasts, and sold products bearing the NHL logo); Glater v. Eli Lilly & Co., 744 F.2d 213, 215-17 (1st Cir. 1984) (defendant employed eight sales representatives in forum, conducted business in the state, and advertised in trade journals that circulated there).

### C. Piercing the Corporate Veil Inquiry

While the general jurisdiction inquiry is more stringent than that for specific jurisdiction, Noonan,135 F.3d at 93, "[t]he bar is set even higher in a case like this one, in which plaintiffs seek to disregard the corporate form." Negron-Torres, 478 F.3d at 27 (quotations omitted). "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." U.S. v. Bestfoods, 524 U.S. 51, 61 (1998). However, the corporate veil may be pierced and the parent held liable for the subsidiary's conduct "where the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the [parent's] behalf." Id. at 62.

Under the federal veil-piercing standard, a court must consider: "(1) whether the parent and subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals' part, and (3) whether a substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield." Pleasant Street I, 960 F.2d at 1093.

To determine the independence of a parent and its subsidiary, the court looks to the following factors:

> (1) whether a corporation is operated as a separate entity; (2) commingling of funds and other assets; (3) failure to maintain adequate records or minutes; (4) the nature of the corporation's ownership and control; (5) absence of corporate assets and undercapitalization; (6) use of a corporation as a mere shell, instrumentality or conduit of an individual or another corporation; (7) disregard of legal formalities and the failure to maintain an arms-length relationship among related entities; and (8) diversion of the corporation's funds or assets to noncorporate uses.

InterGen N.V. v. Grina, 344 F.3d 134, 149 (1st Cir. 2003). A plaintiff must establish more than just the "normal badges of ownership, 'such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures,'" In re Lupron, 245 F.Supp. 2d at 291 (quoting Bestfoods, 524 U.S. at 72), or the sharing of directors, officers and employees. Id. (citing Pleasant Street I, 960 F.2d at 1083-84, 1091).

Relators claim that Akzo Nobel and Organon lacked an arms-length relationship because the functions of Akzo Nobel's corporate center and business units overlapped, Akzo Nobel and Organon shared common employees, and Organon's CEO reported to Akzo Nobel's CEO and sat on Akzo Nobel's board. They also note that Akzo Nobel had "final say" over Organon's pharmaceutical budgets and marketing plans, required Organon to send regular reports on its market trends and sales, paid the salaries of Organon USA's in-house counsel, and required Organon USA to seek approval before it could give its employees a raise in excess of ten percent. None of these allegations demonstrates more than the "normal badges" of corporate ownership. Since Relators fail to establish that Akzo Nobel and Organon had anything other than an arms-length parent-subsidiary relationship, much less that Akzo Nobel was attempting to shirk its

16

legal obligations,[9] veil-piercing is unwarranted. Pleasant Street I, 960 F.2d at 1093 ("It is only when the quest to limit corporate responsibility evolves into a specific effort to evade a parent corporation's legal obligations that the possibility of veil piercing begins to loom.").

### D. Jurisdictional Discovery

Although a plaintiff who makes a "colorable claim" for the existence of personal jurisdiction over a defendant may be entitled to "a modicum of jurisdictional discovery," "that entitlement is not absolute." Swiss Am. Bank, 274 F.3d at 625 (citations and quotation marks omitted). For the aforementioned reasons, Relators fail to make a colorable claim for jurisdiction. Even if they had, given the court's "broad discretion to decide whether discovery is required," id. at 626, and Relators' failure to meet their "obligation to` present facts to the court which show why jurisdiction would be found if discovery were permitted," id. (citations omitted), their discovery request is denied.

## III. Conclusion

Per the court's Order of March 30, 2012 (Docket # 167), Defendant Akzo Nobel N.V.'s motion to dismiss for lack of personal jurisdiction (Docket # 116) is ALLOWED, and its supplemental motion to dismiss (Docket # 126) is DENIED AS MOOT.

---

[9] The court does not credit Relators' unsupported, conclusory allegations that the Organon Defendants "were mere instrumentalities and/or agents of Akzo Nobel" or that Organon was a mere "shell" for Akzo Nobel because the latter "used Organon USA" as a "conduit to gain FDA approval for Remeron."

17

April 9, 2012  /s/Rya W. Zobel
DATE  RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE