UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 07-12153-RWZ

UNITED STATES OF AMERICA *ex rel.*
JAMES BANIGAN AND RICHARD TEMPLIN *et al.*

v.

PHARMERICA, INC.

MEMORANDUM OF DECISION

April 30, 2018

ZOBEL, S.D.J.

In 2007, relators James Banigan and Richard Templin brought this qui tam action on behalf of the United States of America, twenty-seven states, and two cities under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and various state and local analogs, against pharmaceutical company Organon USA Inc. and related companies, and long-term care pharmacy providers Omnicare, Inc. and PharMerica, Inc. All defendants save PharMerica have since settled. In 2012, I dismissed all federal and local claims against PharMerica, as well as eighteen state claims. United States ex rel. Banigan v. Organon USA Inc., 883 F. Supp. 2d 277, 299 (D. Mass. 2012) ("Banigan I"). The parties later voluntarily dismissed all but three of the remaining state claims – Louisiana, Michigan, and Texas – which are the target of defendant's instant motion to dismiss. Docket # 517. Relators seek to revive the claims dismissed in 2012. Docket # 519 (Amended Motion for Reconsideration).

1

**I.    Background**

The FCA provides civil penalties against any person who makes false or fraudulent claims to the United States Government, or who knowingly causes such a claim to be paid.  31 U.S.C. §§ 3729(a)(1)-(3), (7).  The claims in this case are predicated on the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), compliance with which is a condition of payment for any claim submitted to a federal health care program, including Medicaid.  See United States ex rel. Westmoreland v. Amgen, 812 F. Supp. 2d 39, 54-55 (D. Mass. 2011) (collecting cases holding that violations of the Anti-Kickback Statute triggers FCA liability).

Long-term care pharmacy providers ("LTCPs") like defendant PharMerica serve as pharmacies to nursing homes and similar facilities whose residents are largely Medicaid patients.  For each state Medicaid program to which they submit prescription drug reimbursement claims, LTCPs must enter provider agreements requiring compliance with all state and federal laws, including the Anti-Kickback Statute.  Relators are former Organon employees who allege that from 1999 through 2005 the company violated the Anti-Kickback Statute by offering financial incentives to LTCPs including PharMerica to prescribe its antidepressant Remeron.  Pursuant to this scheme, relators allege that PharMerica filed hundreds of millions of dollars in fraudulent claims for Medicaid drug reimbursements in violation of the FCA.

It is the law of the case that this kickback scheme was first revealed in a 2002 complaint filed in the Eastern District of Louisiana.  See Banigan I, 883 F. Supp. 2d at 288 (citing United States ex rel. St. John La Corte v. Amerisource Bergen Corp. and PharMerica, Inc., No. 02–3168 (E.D.La.) ("Amerisource")).  Because the FCA rewards

only relators who alert the government to fraud of which it previously had no knowledge, I held the bulk of claims in Banigan I to be jurisdictionally barred by the earlier Amerisource action. Specifically, the FCA's "public disclosure bar" provides that "[n]o court shall have jurisdiction over an action ... based upon the public disclosure of allegations or transactions in a ... civil ... hearing ..., unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2006).[1] Banigan I applied the public disclosure bar without analysis of the exception for original sources, 883 F. Supp. 2d at 289, and relators moved for reconsideration.[2]

## II. Legal Standard

"The threshold question in a False Claims Act case is whether the statute bars jurisdiction." United States ex rel. Duxbury v. Ortho Biotech Prod., L.P., 579 F.3d 13, 20–21 (1st Cir. 2009) (quoting United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 727 (1st Cir. 2007)). Because jurisdiction "in gross" is unavailable under the FCA, "[a] relator's eligibility to assert each claim alleged in the complaint must be examined

---

[1] As noted in Banigan I, the language of 31 U.S.C. § 3730(e)(4) – encompassing both the public disclosure bar and the definition of original source -- were significantly amended by the 2010 Patient Protection and Affordable Care Act ("PPACA"), Pub. L. 111-148, 124 Stat.119. Because PPACA does not mention retroactivity, Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 283 n.1 (2010), I apply the version of section 3730(e) in effect at the time this case was filed. Id. (applying prior version of statute to interpret scope of public disclosure bar in case filed in 2001).

[2] In addition to the public disclosure bar, Banigan I applied another jurisdictional bar known as the "first-to-file" rule. 883 F. Supp. 2d at 286, 289 (citing 31 U.S.C. § 3730(b)(5)). In 2015, the Supreme Court held that, under section 3730(b)(5), "an earlier suit bars a later suit while the earlier suit remains undecided but ceases to bar that suit once it is dismissed." Kellogg Brown & Root Services, Inc. v. United States ex rel. Carter, 135 S. Ct. 1970, 1978 (2015). See United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 3 (1st Cir. 2015) (citing Carter for proposition that "dismissal of a section 3730(b)(5) claim ordinarily should be without prejudice, because the claim could be refiled once the first-filed action is no longer pending."). Although the parties do not now emphasize this issue, for narrative clarity I note that after Carter the first-filed bar no longer blocks relators' claims: Amerisource was dismissed on March 9, 2006, and relators filed their original complaint in this case on September 13, 2007.

3

separately." United States ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 326 (D. Mass. 2011) (citing Rockwell Int'l Corp. v. United States, 549 U.S. 457, 476 (2007)). "The proponent of federal jurisdiction bears the burden of proving its existence by a preponderance of the evidence." United States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009). At this stage, I nonetheless accept as true all well-pleaded facts and resolve all reasonable inferences in relators' favor. See United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 206 (1st Cir. 2016).

### III. Discussion

Relators press their original source status as basis both for reviving the federal claims and nine of the state claims dismissed in Banigan I, and for denying PharMerica's motion to dismiss the three state claims that remain. PharMerica, conversely, insists that because relators are not original sources, the public disclosure bar compels dismissal of all remaining claims. I begin with the statute -- which the parties agree governs their state claims[3] -- before turning to a factual analysis of what each relator knew when, according to the Third Amended Complaint ("TAC").

#### A. The "Original Source" Exception

The original source exception to the public disclosure bar represents the FCA's central purpose in "[s]eeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of

---

[3] It is undisputed that Louisiana, Michigan, and Texas each have public disclosure bars and original source exceptions identical in all relevant respects to the FCA's. See La. Rev. Stat. § 46:439.1; MCL 400.610a(13); Tex. Hum. Res. Code § 36.113(b). See also Docket # 527, at 12; # 518, at 9, 13, 14. Similarly with respect to the state claims dismissed in Banigan I, the parties then agreed that those statutes "mirror" the FCA. 883 F. Supp. 2d at 299 (dismissing claims under state and local false claims statutes of California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, and Virginia).

opportunistic plaintiffs who have no significant information to contribute of their own." United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Baxter Healthcare Corp., 772 F.3d 932, 944 (1st Cir. 2014) (quoting Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 294 (2010)).  As defined by statute at the time relators' complaint was filed, an original source is "an individual who has <u>direct and independent knowledge</u> of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added).

"A relator's knowledge is 'direct' if []he acquired it through [his] own efforts without an intervening agency, and it is 'independent' if [his] knowledge is not dependent on the public disclosure."  United States ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 93 (D. Mass. 2001).  Ultimately, "direct and independent knowledge must be something more than secondhand information or collateral research and investigations."  In re Pharm. Indus. Average Wholesale Price Litig., No. 01-cv-12257, 2010 WL 1375298, at *2–3 (D. Mass. Mar. 25, 2010) ("AWP") (citations omitted).  "The Court thus takes as its touchstone the purpose behind the statute, to encourage suits by those who are 'close observers or otherwise involved in the fraudulent activity.'"  Id. at *5, (quoting discussion of legislative history in United States ex rel. Barth v. Ridgedale Elec., Inc., 44 F.3d 699, 703 (8th Cir. 1995)).

B.     **Relators' Roles and Discovery of the Fraud**

Relator Banigan worked in various roles for Organon from 1991-2008.  He began as a sales representative before being promoted to Regional Account Manager and

5

National Account Manager.  In 1996, he became Manager of Government Accounts, in which capacity he was responsible for ensuring that Organon drugs were on states' Medicaid formularies.  Banigan first heard about the scheme from two Organon employees in November of 2003, "just as it was winding down."  Id. ¶ 277.  In the context of unstable organizational leadership at the company at that time, Butch McKenna, Manager for Senior Care within Organon's National Accounts Division, told Banigan that he had evidence he would use as an "insurance policy" against Organon in the event it tried to "squeeze him out."  TAC ¶¶ 273, 277.  Specifically, McKenna "informed Banigan that he had direct knowledge of the Medicaid scheme and comprehensive documentation of marketing materials and other communications used to communicate to customers how to maximize their profits by influencing providers to prescribe Remeron."  Id. ¶ 277.  Banigan saw none of these materials firsthand and did not investigate the matter further.

In a conversation the next day, a second Organon employee -- John Maddox, an Executive Account Manager for Organon responsible for Long Term Care and Managed Markets accounts – also "implicated the Marketing Department for producing materials used to highlight how to maximize profit."  Id. ¶ 278.  Similarly "prompted by changes in management" to broach the topic with Banigan, id. ¶ 277, Maddox revealed that Marketing "had recently become aware that the risk associated with continuation of this marketing scheme was too high."  Id. ¶ 278.  In any event, the scheme had fully concluded by December 31, 2005.  Banigan still had not seen any of the materials at issue in early 2006 when he moved to a new position involving parties not privy to the alleged fraud.

6

Like Banigan, Relator Templin learned of the scheme from McKenna and Maddox. Hired in March 2006, Templin worked as Director of Government Accounts until his June 2008 termination. On September 27, 2006, Maddox "divulged [to Templin] the existence of a 'non-compliant' program that provided him with a 'get-out-of-jail-free card with Organon.'" Id. ¶ 273. Maddox "did not offer any significant detail about the program" at the time, so Templin "decided to investigate further on his own." Id. Having learned that the scheme focused on Remeron in the long-term care market, Templin raised the issue with McKenna in late 2006 or early 2007. McKenna confirmed the existence of a Remeron scheme called "Time to Profit" and his possession of related marketing materials. Because McKenna, like Maddox, viewed his knowledge of the alleged fraud as "a golden ticket" should his job become insecure, he retained the marketing materials at his home office.

Armed with this knowledge, Templin approached Banigan in April 2007. Banigan confirmed the existence of the scheme. Although he had "never seen for himself the marketing materials described by McKenna and Maddox," Banigan decided to look for them following his conversation with Templin. Id. ¶ 279. Unable to locate the materials internally at Organon, Banigan eventually secured original copies of two binders of promotional materials from a former Remeron brand director. Banigan and Templin also located draft copies of McKenna's and Maddox's 2001 business plans which further evidenced the promotion of financial incentives to LTCPs. Now familiar with the contours of the scheme, the relators reviewed old Remeron long-term care contracts and found them to evidence "the same types of incentives reflected in the promotional

7

materials." Id. ¶ 279. They subsequently brought this qui tam action in September 2007.

C. Analysis

As detailed above, the original source exception to the public disclosure bar requires that a relator's knowledge of the alleged fraud be both direct and independent. The facts here raise no dispute as to the independence of either relator's knowledge, where the insights they gleaned from Maddox and McKenna were clearly not based on the Amerisource filing. See O'Keeffe, 131 F. Supp. 2d at 93 (knowledge not derived from public disclosures is independent.) The discussion that follows thus analyzes only whether relators' knowledge is also "direct."

Relators argue that as Organon employees, they were close observers with direct knowledge of the alleged fraud. In support, they rely principally on two cases decided in this district. See Docket # 519-1, at 18, Docket # 527, at 14 (both citing United States ex rel. Hutcheson v. Blackstone Med., Inc., 694 F. Supp. 2d 48, 60 (D. Mass. 2010), rev'd on other grounds, 647 F.3d 377 (1st Cir. 2011), and AWP, No. 01-cv-12557, 2010 WL 1375298, at *5. Both are distinguishable.

The relator found to be an original source in Hutcheson was an employee of the defendant who herself observed the defendant's business practices and was privy to meetings, conversations, and other internal communications. 694 F. Supp. 2d at 60. Additionally, "[i]n the regular course of her job duties, she also had access to email and internal documents and data which reflected the conduct discussed in the complaint." Id. (emphasis added).

In AWP, the court dispensed with any distinction between "firsthand" and "secondhand" knowledge to ask instead whether each relator was a "close observer" of the alleged fraud. AWP, No. 01-cv-12557, 2010 WL 1375298, at *4-5 (citing legislative history of FCA). One relator in that case, Sun, satisfied this standard by being present at the hatching of a scheme with which she was intimately involved and having access to related documents and essential information at the fraud's inception. Id., at *4. Another relator, Hamilton, was also deemed an original source where his knowledge was not merely the result of "collateral research and investigations." Id. at *5 (quoting Barth, 44 F.3d at 703). Rather, he was "consulted as part of a professional relationship by one of the critical players in the alleged fraud regarding the fraud's very nature as the fraud was occurring. This suffices to make him a 'close observer' of the fraud, and thus to make his knowledge of an essential element of the fraud 'direct.'" Id. Importantly, the "critical player" not only reported the scheme to Hamilton, "but also came to him specifically for his ideas and advice for solving an ongoing problem, which was at the very heart of [defendant's] alleged fraud." Id.

In contrast to both of these cases, Banigan's conversations with Maddox and McKenna in 2003 occurred in the context of their broader concerns about management turmoil and job security. Although Banigan claims contemporaneous knowledge of the alleged fraud, TAC ¶ 270, he did not see any of the corroborating documents until more than a year after the scheme concluded, and even then not in the regular course of his job duties but as part of "collateral research and investigations." See AWP, No. 01-cv-12557, 2010 WL 1375298, at *5. This is insufficient to show direct knowledge. See United States ex rel. Estate of Cunningham v. Millennium Labs. of California, Inc., 713

9

F.3d 662, 674 (1st Cir. 2013) ("[W]hile Relator claims in a conclusory manner that he conducted an independent investigation of Millennium's fraudulent practices, he fails to show how the knowledge he obtained was 'direct.' Specifically, the sources he lists for obtaining the information—Calloway's sales force and lead industry personnel—are third parties, and Relator makes no argument to meet his burden to show that the information gleaned from those sources is 'marked by the absence of an intervening agency, instrumentality, or influence.'") (quoting Ondis, 587 F.3d at 59). See also O'Keeffe, 131 F. Supp. 2d. at 96 ("By Relator's own admission, he would not have been able to discover the alleged fraud without the information obtained in the interviews. Relator's knowledge of the fraud is therefore mediated by the interviewees and constitutes second-hand information at best."). Banigan is thus not an original source.

For substantially the same reasons, Templin is not an original source. Additionally, Templin claims no contemporaneous knowledge of the alleged fraud, having been hired over a year after the scheme's conclusion. His status as an original source cannot be redeemed by the conclusory allegation that he "became aware of the scheme through the normal course of his job duties." TAC ¶ 272. See Duxbury, 579 F.3d at 28 (court "under no obligation to credit [relator's] conclusory allegations, which simply parrot the elements of the statute."). See also United States ex rel. Bartz v. Ortho-McNeil Pharm., Inc., 856 F. Supp. 2d 253, 267 (D. Mass. 2012) (relator's conclusory claim that he was "well positioned to observe [the fraud] first-hand" was insufficient to surmount public disclosure bar).

## IV. Conclusion

Because neither relator had direct knowledge, neither qualifies as an original source, and their FCA action is therefore precluded under the public disclosure bar. Each of the remaining three state claims contains a public disclosure bar undisputed to be "nearly identical" to the FCA's. See note 3, supra. Accordingly, Relators' Motion for Reconsideration (Docket # 520) is DENIED, and Defendant's Motion to Dismiss Counts XIV (Louisiana), XVI (Michigan), XXVI (Texas), and XXXV (Common Fund Relief) (Docket # 517) is ALLOWED.

Judgment may be entered for defendant.

| April 30, 2018 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL<br>SENIOR UNITED STATES DISTRICT JUDGE |